## OHIO OIL COMPANY *v.* INDIANA (NO. 1).

ERROR TO THE SUPREME COURT OF THE STATE OF INDIANA.

No. 84.   Argued December 18, 19, 1899. — Decided April 9, 1900.

The provision in the act of March 4, 1893, of the State of Indiana "that it shall be unlawful for any person, firm or corporation having possession or control of any natural gas or oil well, whether as a contractor, owner, lessee, agent or manager, to allow or permit the flow of gas or oil from any such well to escape into the open air without being confined within such well or proper pipes, or other safe receptacle, for a longer period than two days next after gas or oil shall have been struck in such well; and thereafter all such gas or oil shall be safely and securely confined in such well, pipes or other safe and proper receptacles," is not a violation of the Constitution of the United States; and its enforcement as to persons whose obedience to its commands were coerced by injunction, is not a taking of private property without adequate compensation, and does not amount to a denial of due process of law, contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States, but is only a regulation by the State of Indiana of a subject which especially comes within its lawful authority.

THE title, preamble and first section of a law enacted March 4, 1893, by the State of Indiana, (Acts of 1893, c. 36, p. 300,) are as follows:

"An act concerning the sinking, safety, maintenance, use and operation of natural gas and oil wells, prescribing penalties and declaring an emergency.

"Whereas, great danger to life, and injury to persons and property is liable to result from the improper, unsafe and negligent sinking, maintenance, use and operation of natural gas and oil wells; therefore,

"Section 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person, firm or corporation having possession or control of any natural gas or oil well, whether as a contractor, owner, lessee, agent or manager, to allow or permit the flow of gas or oil from any such well to escape into the open air, without being confined within

such well or proper pipes or other safe receptacle, for a longer period than two (2) days next after gas or oil shall have been struck in such well. And thereafter all such gas or oil shall be safely and securely confined in such well, pipes or other safe and proper receptacles."

The remaining sections of the law in question are printed in the margin.[1]

---

[1] SEC. 2. Whenever any well shall have been sunk for the purpose of obtaining natural gas or oil or exploring for the same, and shall be abandoned or cease to be operated for utilizing the flow of gas or oil therefrom, it shall be the duty of any person, firm or corporation having the custody or control of such well at the time of such abandonment or cessation of use, and also of the owner or owners of the land wherein such well is situated, to properly and securely stop and plug the same as follows: If such well has not been "shot" there shall be placed in the bottom of the hole thereof a plug of well-seasoned pine wood, the diameter of which shall be within one half inch as great as the hole of such well, to extend at least three feet above the salt water level, where salt water has been struck; where no salt water has been struck, such plug shall extend at least three feet from the bottom of the well. In both cases such wooden plugs shall be thoroughly rammed down and made tight by the use of drilling tools. After such ramming and tightening the hole of such well shall be filled on top of such plug with finely broken stone or sand, which shall be well rammed to a point at least four feet above the Trenton limestone, or any other gas or oil bearing rock; on top of this stone or sand there shall be placed another wooden plug at least five feet long with the diameter as aforesaid, which shall be thoroughly rammed and tightened. In case such well shall have been "shot," the bottom of the hole thereof shall be filled with a proper and sufficient mixture of sand, stone and dry cement, so as to form a concrete up to a point at least eight feet above the top of the gas or oil-bearing rock or rocks, and on top of this filling shall be placed a wooden plug at least six feet long, with diameter as aforesaid, which shall be properly rammed as aforesaid. The casing from the well shall then be pulled or withdrawn therefrom, and immediately thereafter a cast-iron ball eight inches in diameter shall be dropped in the well and securely rammed into the shale by the driller or owner of the well, after which not less than one cubic yard of sand pumping or drilling taken from the well shall be put on top of said iron ball.

SEC. 3. Any person or corporation violating any of the provisions of this act shall be liable to a penalty of two hundred dollars for each and every such violation, and to the further penalty of two hundred dollars for each ten days during which such violation shall continue; and all such penalties shall be recoverable in a civil action or actions, in the name of the State of Indiana, for the use of the county in which such well shall be located, together with reasonable attorneys' fees and costs of suit.

The issue which this record presents, on the subject of the law just referred to, is this: Did the enforcement of the first section of the statute produce as to the persons whose obedience to its commands were coerced by injunction, a taking of private property without adequate compensation; that is, did the execution of the statute amount to a denial of due process of law contrary to the provisions of the Fourteenth Amendment to the Constitution of the United Statutes?

The controversy was thus initiated. The State of Indiana, through its attorney general, filed a complaint in the Circuit Court of the county of Madison in the State of Indiana, against the Ohio Oil Company, a corporation organized under the laws of the State of Ohio, but authorized to carry on its business in the State of Indiana, as it had complied with the regulations enacted by that State as to foreign corporations doing business therein. The cause of complaint was thus stated:

"Plaintiff says that for many years heretofore there has

SEC. 4. Whenever any person or corporation in possession or control of any well in which natural gas or oil has been found shall fail to comply with the provisions of this act, any person or corporation lawfully in possession of lands situate adjacent to or in the vicinity or neighborhood of such well may enter upon the lands upon which such well is situate and take possession of such well from which gas or oil is allowed to escape in violation of the provisions of section one of this act, and pack and tube such well and shut in and secure the flow of gas or oil, and maintain a civil action in any court of competent jurisdiction in this State against the owner, lessee, agent or manager of said well, and each of them jointly and severally, to recover the cost and expense of such tubing and packing, together with attorneys' fees and costs of suit. This shall be in addition to the penalties provided by section three of this act.

SEC. 5. Whenever any person or corporation shall abandon or cease to operate any natural gas or oil well, and shall fail to comply with the provisions of section two of this act, any person or corporation lawfully in possession of lands adjacent to or in the vicinity or neighborhood of such well may enter upon the lands upon which such well is situate and take possession of such well, and plug and fill the same in the manner provided by section two of this act, and may maintain a civil action in any court of competent jurisdiction of this State against the person, persons or corporation so failing, jointly and severally, to recover the costs and expenses of such plugging and filling, together with attorneys' fees and costs of suit. This shall be in addition to the penalties provided by section three of this act.

existed, underlying the counties of Madison, Grant, Howard, Delaware, Blackford, Tipton, Hamilton, Wells and other counties of the State of Indiana, a large subterranean deposit of natural gas, occupying a reservoir of large extent, with well-defined boundaries, and utilized for fuel and light by the people of those counties and many other counties and cities of Indiana, including Indianapolis, Fort Wayne, Richmond, Logansport, Anderson, Muncie, Marion, Kokomo, and others of the most populous cities of said State, to which cities said gas is conducted, after being brought to the surface of the earth, through pipes and conduits, by means of which many hundreds of thousands of the people of the State of Indiana are now, and have been for more than ten years last past, continuously supplied with gas for light and fuel; that said natural gas, underlying the counties aforesaid and other portions of the State, is contained in and percolates freely through a stratum of rock known as Trenton rock, comprising a vast reservoir in which the gas is confined under great pressure and from which it escapes, when it is permitted to do so, with great force.

" The fuel supplied by the natural gas thus obtained is the cheapest and best known to civilization, and the value of the natural gas deposit to the State and to its citizens is many millions of dollars; that since the discovery of said gas deposit in 1886 immense sums of money have come into the State and have been invested in large manufacturing interests, and other vasts sums of money belonging to the people of the State of Indiana have been invested in similar enterprises, causing a great increase in the population, principally in the territory underlying which said gas is found. Many cities in and adjacent to the gas territory, including those named, are wholly dependent for fuel upon natural gas, and for that reason the people of the State of Indiana have become and are interested in the protection and continued preservation of the natural gas supply; that many millions of dollars invested in manufacturing and other properties in and near said gas territory are wholly dependent for their continued preservation and for the permanent value of their property upon said natural gas supply; that their location and establishment in said gas territory was due

to the presence of natural gas underlying the same, without which such enterprises could not operate at a profit, and that in the event the supply of gas should be exhausted in said territory many of such manufacturing enterprises, in which thousands of the citizens of Indiana find employment at remunerative wages, will be compelled to stop operation.

"That their employés will be thereby thrown out of employment, and many of them, being dependent upon their labor for support, may and will become charges upon the State and its several municipal subdivisions; that the property of said manufacturing enterprises and the vast investments depending upon them and related to them will become worthless and the owners will be driven to remove to other parts of the country, taking away from Indiana great wealth now interested in said enterprises as aforesaid.

"That in the cities named and in all the territory known as the 'gas belt' the inhabitants have for years used practically no other fuel than natural gas; that their houses have, in many instances, been constructed with a view to the use of such fuel, and will have to be differently equipped before other kinds of fuel can be used; that the cost of natural gas as fuel to the people of the 'gas belt,' who number several hundreds of thousands, is very much less than that of any other fuel that has ever been or can be procured by them, and that to the other inhabitants of the State using said natural gas it has become and is a source of great convenience, comfort and increased happiness, because of its cheapness, convenience and cleanliness as fuel.

"That many small villages in and near the gas territory have within a few years become flourishing and opulent cities.

"That the State's wealth and its revenues derived from taxation on account of such increased population and the various interests that have been fostered and supported by natural gas have been greatly increased, and will, in the event natural gas gives out, be correspondingly curtailed.

"That the State of Indiana, relying upon the permanent supply of natural gas, has at great expense equipped many of its public institutions, including the state-house, the Central and

other hospitals for the insane, the asylums for the blind and deaf and dumb, the institution for the care of orphans of American soldiers, and other public institutions owned and maintained by the State of Indiana and its various municipal subdivi-- sions, together with the court houses in many counties, and a vast number of public schools, for the use of natural gas as a fuel, by which the cost of maintaining the public buildings and institutions above named has been materially lessened and the comfort and happiness of their inmates and occupants immensely increased.

"That the supply of natural gas underlying the territory aforesaid is so placed in such Trenton rock that the diminution or consumption of said gas taken from said reservoir affects and reduces correspondingly the common supply.

"That if the gas supply is husbanded and protected it will last for many years and continue to furnish the various cities named with abundant fuel, and the population, wealth and other material interests of the State will continue to be benefited and enhanced and the comfort, happiness and enjoyment of the people of the State greatly increased.

"That underlying a portion of said natural gas territory and at the same levels, occupying the interstices — said Trenton rock in common with said gas, are large quantities of petroleum oil; and that, because of the volatile character of said gas and the pressure under which it is confined in said Trenton rock when said reservoir is tapped by wells drilled into the same from the surface of the earth, said gas and oil will and do escape into the open air in great volumes, unless securely confined in tanks or other proper receptacles.

"That on or about the 25th day of May, 1897, said defendant, the Ohio Oil Company, drilled, near the city of Alexandria, in said Madison County, a number of wells into said gas and oil bearing rock, producing natural gas and petroleum as aforesaid in large quantities, which wells are known by the name of the land owner upon whose land they are situated, which name and the description of said wells are as follows, to wit."

The complaint then enumerated five gas and oil wells which

had been opened and were being operated by the defendant for extracting oil, and averred as follows:

"That instead of securely anchoring said wells and each of them when so drilled so as to confine within the same or within tanks or pipes or other safe receptacles the natural gas produced therefrom within two days after said wells were respectively completed and gas and oil was struck therein, the said defendants, ever since the completion of said wells, all of which have been completed for periods varying from four to nine months, have unlawfully permitted the gas produced therein to flow and escape into the open air, whereby many millions of cubic feet of natural gas have been greatly diminished, and the property of its citizens in and near said gas territory dependent upon the continued supply of said natural gas for fuel, as aforesaid, has been greatly damaged and decreased in value.

"That the defendants and each of them avow their purpose to permit said gas to escape continuously and indefinitely hereafter from such wells, and refuse to make any effort to confine the same, but declare their purpose to drill other wells in said gas territory and permit the gas therefrom to flow and escape into the open air, and that if said gas continues to flow from said wells the supply of natural gas upon which the citizens of said State depend, as aforesaid, will be greatly diminished; that the pressure of said gas, as found in said Trenton rock, will be greatly diminished, and that by the diminution of said pressure water will accumulate in said rock stratum and ultimately entirely displace and overcome said gas supply.

"Plaintiff, therefore, says that, because of the wrongful acts of defendants above described, heretofore committed and now continuing, its property and that of its citizens has been and will continue to be essentially interfered with, and the comfortable enjoyment of the lives of its citizens greatly interrupted."

Averring the irreparable injury to result from allowing the wells to continue to flow, as stated, the inadequacy of the enforcement of the penalties provided in the statute to meet the evil complained of, and the fact that a multiplicity of suits would be engendered if the writ of injunction prayed for was not issued, the bill charged —

" That the value of the gas wasted by permitting said several wells to remain open each day is of great value, and that, in addition to the value of the same, the whole gas territory or field is greatly damaged by permitting said wells to remain open, in that what is known as ' back pressure,' resulting from the confinement of said gas, is in a great measure relieved and destroyed when said gas is liberated in the manner aforesaid, and that said back pressure is necessary throughout said field in order to prevent the flow of water into said rock stratum and the consequent displacement of the gas therein contained; that, for the protection of said gas supply from the invasion of salt water, it is necessary that in the use of gas from wells drilled into said reservoir only a fraction of the entire volume of said wells should be used, to the end that the back pressure shall be maintained at as high a pressure as possible, and that any other or freer method of using said gas has a tendency to expose the same to danger of salt water, as aforesaid."

The prayer was as follows:

" And plaintiff therefore prays that a temporary order issue forthwith from this court prohibiting, restraining and enjoining said defendant, its agents, servants and employés, from further suffering or permitting the natural gas produced in said wells or any of them, or any part thereof, to longer escape therefrom, and that said defendant be ordered, directed and commanded forthwith to securely confine the same either by anchoring each of said wells or by confining the gas produced therefrom in tanks, pipes or other proper receptacles, and that failing or refusing so to do the sheriff of Madison County be ordered and directed forthwith to procure necessary materials and labor and thereby anchor, secure and confine the natural gas produced from said wells and each of them, and that the expense of so doing be taxed as part of the costs of this suit.

" And the plaintiff further prays that upon the final hearing of this cause said defendant company, its officers, servants, agents and employés, be perpetually enjoined and prohibited from further suffering said gas to escape, and that they be forever thereafter commanded to confine said gas safely and securely in pipes, tanks or other proper receptacles, and for all proper relief."

The temporary injunction issued as prayed for. The defendant appeared and demurred to the complaint as not stating a cause of action. This was overruled. The defendant then answered as follows:

"The defendant, further answering, says that before and at the commencement of this action it had in good faith been and then was engaged in the business of producing oil by drilling therefor in the earth and rock below in said county of Madison, and that in the carrying on of said business it has expended many thousands of dollars in the leasing of territory, the purchase of machinery and equipment thereof, and for the drilling of a number of wells and for pipes and pipe lines, all of which it then owned and still owns.

"The defendant admits that it drilled the well complained of herein, but says that said well was so drilled in good faith solely for the purpose of raising and producing oil, the defendant not being engaged in the business of producing or transporting natural gas in said county, and having there no plant for that purpose, and such gas in such case being of no value to defendant, and there being reasonable grounds to believe that oil existed in said territory in sufficiently paying quantities to be utilized.

"That said well complained of was not drilled in or near any village, town or city, but, on the contrary, was drilled in the country and remote from any dwelling, and the same as so constructed and operated is not dangerous to life or property.

"That said well was so drilled and completed, oil was found therein in paying quantities, and the defendant proceeded to and did save and utilize the same, paying to the land owner the stipulated royalties therefor, and so operated the same with knowledge, approbation and consent of such land owner, and was so operating the same solely as an oil well and in entire good faith at the time of the commencement of this action; all of which was so done under and by virtue of a lease to defendant by the owner of said land granted before the commencement of this suit, under which lease defendant owns all the gas and oil in said well and under said land, and said well is of great value as an oil well.

"That in said well and in the same strata of rock whence such

oil was produced there were also found at said time quantities of natural gas, which by its own pressure escaped through said pipes and into the open air, said pipes being the same as the ones through which said oil was produced and saved, and in so saving such oil defendant utilized such gas as power, force and agency to raise said oil from the rock-bearing strata below the surface of the ground, such being the usual, natural and ordinary method of raising and saving oil in such cases.

" And the defendant further says that no machinery or process of any kind has ever by the highest skill been devised or known to the world whereby in such a case the oil in such well can be produced and saved, unless at the same time such natural gas as may be in such well is suffered to escape, and the defendant charges the fact to be, therefore, that if such gas shall be shut into such well in such case that it will be impossible to raise or produce oil in any such well, and thereby defendant's said business, together with its said plant, property and profits, will be entirely destroyed and the people of said county and State will be deprived of the use and profits of such oil, which is of vastly more value than natural gas in said well; and the defendant says it so operated said well with the highest skill, with the most improved machinery and appliances known to the world, and with employés of the highest skill, and that no more gas was suffered to escape from such well than was consistent with the due operation of said well with the highest skill.

" The defendant further alleges that for many months before the completion of said well it was openly and publicly engaged in acquiring territory, in equipping said plant, in constructing such oil lines, and in incurring the liabilities and paying the money therefor, as hereinbefore alleged, all with the knowledge and acquiescence of the plaintiff and with no notice or knowledge whatever to or on the part of defendant that it would not be allowed to operate such well or wells until after the said money had been so expended and after said well had been so completed.

" That in the territory where said well complained of is situated there are a number of paying oil wells, owned and operated by various persons and corporations, and said field, when

properly developed, may reasonably be expected to be a large one for the production of oil, which will be and is of great value to the people of said county."

Referring to the law of Indiana, the context of which has already been stated, the answer contained this averment:

"This defendant further alleges that said act of the general assembly of the State of Indiana, as above set out, violates the Fourteenth Amendment of the Constitution of the United States in this, that it deprives the defendant and others of liberty and property without due process of law, and denies to defendant and others the equal protection of the laws."

The State demurred to the answer as not alleging facts sufficient to constitute a defence. This demurrer was sustained. The defendant refusing to answer further, a decree granting a permanent injunction was entered. An appeal having been prosecuted to the Supreme Court of the State of Indiana, in that court the decree of the trial court was in all respects affirmed. 50 N. E. Rep. 1125. This writ of error was thereupon allowed.

*Mr. M. F. Elliott* and *Mr. George Shirts* for plaintiff in error.

*Mr. C. C. Shirley* and *Mr. William M. Taylor* for defendant in error. *Mr. Merrill Moores* was on their brief.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The assignments of error all in substance are resolvable into one proposition; which is, that the enforcement of the provisions of the Indiana statute as against the plaintiff in error, constituted a taking of private property without adequate compensation, and therefore amounted to a denial of due process of law in violation of the Fourteenth Amendment.

When this proposition is analyzed by the light of the facts which are admitted on the record, it becomes apparent that the foundation upon which it must rest involves two contentions which are in conflict one with the other; in other words, the argument by which alone it is possible to sustain the claim be-

comes, when truly comprehended, self-destructive. Thus, it is apparent, from the admitted facts, that the oil and gas are commingled and contained in a natural reservoir which lies beneath an extensive area of country, and that as thus situated the gas and oil are capable of flowing from place to place, and are hence susceptible of being drawn off by wells from any point, provided they penetrate into the reservoir. It is also undoubted that such wells, when bored from many points in the superincumbent surface of the earth, are apt to reach the reservoir beneath. From this it must necessarily come to pass that the entire volume of gas and oil is in some measure liable to be decreased by the act of any one who, within the superficial area, bores wells from the surface and strikes the reservoir containing the oil and gas. And hence, of course, it is certain, if there can be no authority exerted by law to prevent the waste of the entire supply of gas and oil, or either, that the power which exists in every one who has the right to bore from the surface and tap the reservoir involves, in its ultimate conception, the unrestrained license to waste the entire contents of the reservoir by allowing the gas to be drawn off and to be dispersed in the atmospheric air, and by permitting the oil to flow without use or benefit to any one. These things being lawful, as they must be if the acts stated cannot be controlled by law, it follows that no particular individual having a right to make borings can complain, and thus the entire product of oil and gas can be destroyed by any one of the surface owners. The proposition, then, which denies the power in the State to regulate by law the manner in which the gas and oil may be appropriated, and thus prevent their destruction, of necessity involves the assertion that there can be no right of ownership in and to the oil and gas before the same have been actually appropriated by being brought into the possession of some particular person. But it cannot be that property as to a specified thing vests in one who has no right to prevent any other person from taking or destroying the object which is asserted to be the subject of the right of property. The whole contention, therefore, comes to this: that property has been taken without due process of law, in violation of the Fourteenth Amendment, because of the fact that the thing taken

was not property, and could not, therefore, be brought within the guarantees ordained for the protection of property.

The confusion of thought which permeates the entire argument is twofold: First, an entire misconception of the nature of the right of the surface owner to the gas and oil as they are contained in their natural reservoir, and this gives rise to a misconception as to the scope of the legislative authority to regulate the appropriation and use thereof. Second, a confounding, by treating as identical, things which are essentially separate, that is, the right of the owner of land to bore into the bosom of the earth, and thereby seek to reduce the gas and oil to possession, and his ownership after the result of the borings has reached fruition to the extent of oil and gas by himself actually extracted and appropriated. In other words, the fallacy arises from considering that the means which the owner of land has a right to use to obtain a result is in legal effect the same as the result which may be reached. We will develop the misunderstanding which is involved in the matters just stated.

No time need be spent in restating the general common law rule that the ownership in fee of the surface of the earth carries with it the right to the minerals beneath, and the consequent privilege of mining to extract them. And we need not, therefore, pause to consider the scope of the legislative authority to regulate the exercise of mining rights and to direct the methods of their enjoyment so as to prevent the infringement by one miner of the rights of others. *Del Monte Mining Co.* v. *Last Chance Mining Co.*, 171 U. S. 55, 60. The question here arising does not require a consideration of the matters just referred to; but it is this: Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to actual possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules? True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but except for this one point of similarity, in many other respects they greatly differ. They have no fixed *situs*

under a particular portion of the earth's surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth, within the area beneath which the gas and oil move, can exercise his right to extract from the common reservoir, in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners. Besides, whilst oil and gas are different in character, they are yet one, because they are unitedly held in the place of deposit. In *Brown* v. *Spilman*, 155 U. S. 665, 669, 670, these distinctive features of deposits of gas and oil were remarked upon. The court said:

"Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed *situs*, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property. *Brown* v. *Vandergrift*, 80 Penn. St. 142, 147; *Westmoreland Nat. Gas Co.'s Appeal*, 25 Weekly Notes of Cases, (Penn.) 103."

In *Westmoreland & Cambria Natural Gas Co.* v. *De Witt*, 130 Penn. St. 235, the Supreme Court of Pennsylvania considered the character of ownership in natural gas and oil as these substances existed beneath the surface of the earth. The court said:

"The learned master says gas is a mineral, and while *in situ* is part of the land, and therefore possession of the land is possession of the gas. But this deduction must be made with some qualifications. Gas, it is true, is a mineral; but it is a mineral with peculiar attributes, which require the application of precedents arising out of ordinary mineral rights, with much more

careful consideration of the principles involved than of the mere decisions. Water, also, is a mineral, but the decisions in ordinary cases of mining rights, etc., have never been held as unqualified precedents in regard to flowing or even to percolating waters. Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *feræ naturæ.* In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract was uncertain,' as said by Chief Justice Agnew in *Brown* v. *Vandergrift,* 80 Penn. St. 147, 148. . . . They belong to the owner of the land, and are a part of it, so long as they are on or in it, and are subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas."

In *Hague* v. *Wheeler,* 157 Penn. St. 324, the question involved in the cause was the right of a land owner who had a gas well on his own land to complain of the escape of gas from a well situated on the land of another. After adverting to the rule embodied in the maxim, *sic utere tuo ut alienum non lædas,* and after referring to the exceptional nature of the right to acquire ownership in natural gas and oil, it was decided that the complainant was not entitled to relief. The court said, 340, 341:

"Now, it is doubtless true that the public has a sufficient interest in the preservation of oil and gas from waste to justify legislation upon this subject. Something has been done in this direction already by the acts regulating the plugging of abandoned wells. . . . In the disposition he may make of it (private property) he is subject to two limitations. He must not disregard his obligations to the public. He must not disregard his neighbor's rights. If he uses his product in such a manner as to violate any rule of public policy, or any positive provisions of the written law, he brings himself within the reach of the courts. If the use he makes of his own, or its waste, is injurious to the property or the health of others, such use or waste may be restrained, or damages recovered therefor; but,

subject to these limitations, his power as an owner is absolute until the legislature shall, in the interest of the public, as consumers, restrict and regulate it by statute."

Again, in *Jones* v. *Forest Oil Company*, (January, 1900,) 44 Atl. Rep. 1074, the same subject was once more considered. The complaint was filed by one land owner having a gas well on his land to enjoin the owner of adjoining property from using in a gas well thereon a pump which was asserted to have such power that its operation would draw away the oil and gas from the well of the complainant to that of the defendant. Reviewing the cases to which we have just referred, and after quoting the language of Chief Justice Agnew, in *Brown* v. *Vandegrift, supra,* wherein as we have seen oil and gas were by analogy classed as "minerals *feræ naturæ,*" the court decided:

"From these cases we conclude that the property of the owner of lands in oil and gas is not absolute until it is actually in his grasp, and brought to the surface."

Again, applying the consequences of the doctrine just stated, the court declared:

"If possession of the land is not necessarily possession of the oil and gas, is there any reason why an oil and gas operator should not be permitted to adopt any and all appliances known to the trade to make the production of his wells as large as possible?"

A brief examination of the Indiana decisions, on the subject of oil and natural gas, and the right to acquire ownership thereto, will make it apparent that from the peculiar nature of these substances courts of that State have announced the same rule as that recognized by this court in *Brown* v. *Spilman, supra,* and which has been applied by the Supreme Court of the State of Pennsylvania. In *State ex rel. Corwin* v. *Indiana & Ohio Oil, Gas & Mining Co.,* 120 Indiana, 575, a law of the State of Indiana which made it unlawful for any person to conduct natural gas beyond the State, and imposing penalties for so doing, was assailed as unconstitutional because repugnant to the commerce clause of the Constitution of the United States. The court held the statute to be void for the asserted cause. The

property in natural gas when reduced to actual possession was decided to be like any other property, and therefore the subject of commerce, and within the protection of the Constitution of the United States. In *Jamieson* v. *Indiana Natural Gas & Oil Company*, 128 Indiana, 555, a law of that State which prohibited the transportation of natural gas through pipes at a greater pressure than three hundred pounds per square inch, or otherwise than by its natural flow, was attacked not only on the ground of its interference with the right of property which sprang into existence with the possession of the gas, but because also the act in question was a regulation of interstate commerce. Both contentions were decided to be without merit, substantially on the ground that the dangerous nature of the product, its susceptibility to explosion and the consequent hazard to life and property which might arise from its movement through pipes, made the act of transmitting a fit subject for police regulation. In the course of its opinion the court said :

" The local character of such a substance as natural gas is, we repeat, marked and peculiar. It is a natural product, and its source is in the soil or rocks of the earth. It is as strikingly local as coal or petroleum; and yet no one has ever questioned the power of a State to enact laws governing mining. . . . It is so essentially local that only local regulation can be effective or appropriate. It is found in very few localities, and the character of locality is impressed upon it more clearly and strongly than upon almost any other natural product in the world."

Again, said the court :

" The local and peculiar character of natural gas makes it almost impossible that it should be the subject of general national regulation. . . . Upon this point we affirm that natural gas is characteristic and peculiarly a local product; that its production is confined to a limited territory; that because of its local characteristics and peculiarities it is a proper subject for state legislation, and cannot, so far as regards local production, be made the subject of general legislation by Congress."

In *People's Gas Company* v. *Tyner*, 131 Indiana, 277 and

280, the controversy was this : A lot owner in a town filed a bill for an injunction to prevent a neighboring lot owner from using nitro-glycerine " to shoot" a gas well on his property. The court refused the injunction. In the course of the opinion it was said :

" It has been settled in this State that natural gas when brought to the surface of the earth and placed in pipes for transportation, is property, and may be the subject of interstate commerce. *State* v. *Indiana & Ohio Oil Gas & Min. Co.*, 120 Indiana, 575. Water, petroleum, oil and gas are generally classed by themselves as minerals possessing in some degree a kindred nature."

After quoting authorities relating to subterranean currents of water, and treating gas and oil before being reduced to possession as of a kindred nature, the court said:

" Like water it is not the subject of property, except while in actual occupancy, and a grant of either water or oil is not a grant of the soil or of anything for which ejectment will lie."

The case of *Brown* v. *Vandegrift*, 80 Penn St. 142, from which we have previously quoted, was then referred to, and the analogies between oil and gas and animals *feræ naturæ* were approved and adopted. In *Townsend* v. *State*, 147 Indiana, 624, the constitutionality of a statute forbidding the burning of natural gas in flambeau lights was attacked because it was asserted to violate the Fourteenth Amendment to the Constitution of the United States and various provisions of the constitution of the State of Indiana. The court held that the statute was not amenable to the assaults made upon it. In a full opinion reviewing the nature of the ownership in oil and natural gas, the power of the State to regulate and control their use and waste in the interest of all those within the gas field and of the public at large was elaborately considered. Reviewing its own previous adjudications, which we have cited, and those of the Supreme Court of the State of Pennsylvania, to which we have also referred, it was decided that the owners of the surface of the land within the gas field, whilst they had the exclusive right on their land to sink wells for the purpose of extracting the oil and gas, had no right of property therein

until by the actual drawing of the oil and gas to the surface of the earth they had reduced these substances to physical possession. It was further held that in consequence of the nature of the deposits, of their transmissibility, of their interdependence, of the rights of all and of the public at large, the State could lawfully exercise the power to regulate the right of the surface owners among themselves to seek to obtain possession, and to prevent the waste of the products in which all the surface owners within the area wherein the gas and oil were deposited, as well as the public, had an interest, because in the preservation of these substances the well-being and prosperity of the entire community was largely involved. And it was upon the opinion announced in that case that the court rested its decree in the case now under review.

Without pausing to weigh the reasoning of the opinions of the Indiana court in order to ascertain whether they, in every respect, harmonize, it is apparent that the cases in question, in accord with the rule of general law, settle the rule of property in the State of Indiana, to be as follows. Although in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil, until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. It is also clear from the Indiana cases cited that, in the absence of regulation by law, every owner of the surface within a gas field may prosecute his efforts and may reduce to possession all or every part, if possible, of the deposits without violating the rights of the other surface owners.

If the analogy between animals *feræ naturæ* and mineral deposits of oil and gas, stated by the Pennsylvania court and adopted by the Indiana court, instead of simply establishing a similarity of relation, proved the identity of the two things, there would be an end of the case. This follows because things which are *feræ naturæ* belong to the "negative community;" in other words, are public things subject to the absolute control

of the State, which, although it allows them to be reduced to possession, may at its will not only regulate but wholly forbid their future taking. *Geer* v. *Connecticut,* 161 U. S. 519, 525. But whilst there is an analogy between animals *feræ naturæ* and the moving deposits of oil and natural gas, there is not identity between them. Thus, the owner of land has the exclusive right on his property to reduce the game there found to possession, just as the owner of the soil has the exclusive right to reduce to possession the deposits of natural gas and oil found beneath the surface of his land. The owner of the soil cannot follow game when it passes from his property; so, also, the owner may not follow the natural gas when it shifts from beneath his own to the property of some one else within the gas field. It being true as to both animals *feræ naturæ* and gas and oil, therefore, that whilst the right to appropriate and become the owner exists, proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things *feræ naturæ* all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No divesting of private property, under such a condition, can be conceived because the public are the owners, and the enacting by the State of a law as to the public ownership is but the discharge of the governmental trust resting in the State as to property of that character. *Geer* v. *Connecticut, supra.* On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a co-equal right in them all to take from a common source of supply, the two

substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by things *feræ naturæ*, which it is unquestioned the legislature has the authority to forbid all from taking, in order to protect them from undue destruction, so that the right of the common owners, the public, to reduce to possession may be ultimately efficaciously enjoyed. Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the State of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument, upon which the attack on the statute must depend, involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them, in and to the substances contained in the common reservoir of supply, then as a necessary result of the right of property, its indivisible quality and the peculiar position of the things to which it relates, there must arise the legislative

power to protect the right of property from destruction. To illustrate by another form of statement, the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this, although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be *damnum absque injuria.* This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States.

These considerations are sufficient to dispose of the case. But as there are several contentions which seem to have been considered, in argument, as resting on different premises, though such in reason is not the case, we briefly notice them separately: First. It is argued that as the gas, before being allowed to disperse in the air, serves the purpose of forcing up the oil, therefore it is not wasted, hence is not subject to regulation. Second. That the answer averred that the defendant was so situated as not to be able to use or dispose of the gas which comes to the surface with the oil; from which it follows that the gas must either be stored or dispersed in the air. Now, the answer further asserted that when the gas is stored and not used the back pressure, on the best known pump, would, if not arresting its movement, at least greatly diminish its capacity. Hence it is said the law by making it unlawful to allow the gas to escape made it practically impossible to profitably extract the oil. That is, as the oil could not be taken at a profit by one who made no use of the gas, therefore he must be allowed to waste the gas into the atmosphere, and thus destroy the interest of the other common owners in the reservoir of gas. These contentions but state in a different form the matters already disposed of. They really go not to the power to make the regulations, but to their wisdom. But with the lawful discretion of the legislature of the State we may not interfere.

In view of the fact that regulations of natural deposits of oil

and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by the Supreme Court of Indiana, is ultimately but a regulation of real property, and they must hence be treated as relating to the preservation and protection of rights of an essentially local character. Considering this fact and the peculiar situation of the substances, as well as the character of the rights of the surface owners, we cannot say that the statute amounts to a taking of private property, when it is but a regulation by the State of Indiana of a subject which especially comes within its lawful authority.

*Affirmed.*