**BAY PETROLEUM CORPORATION et al.
v. CORPORATION COMMISSION OF
STATE OF KANSAS et al.**

Civil No. 1861.

District Court, D. Kansas,
Second Division.

Nov. 13, 1940.

Innis D. Harris, of Wichita, Kan., for plaintiffs.

Harold Medill, of Independence, Kan., and John F. Jones, of Topeka, Kan., for defendants.

W. D. Jochems, of Wichita, Kan., for intervenors.

Before BRATTON and HUXMAN, Circuit Judges, and HOPKINS, District Judge.

BRATTON, Circuit Judge.

This is a suit instituted by Bay Petroleum Corporation, hereinafter called Bay, and Dudley D. Morgan, Olney F. Flynn and Russell Cobb, hereinafter called Morgan, Flynn and Cobb, against the Corporation Commission of the State of Kansas, hereinafter called the commission, the members of the commission, and the director of the conservation division of the commission, to enjoin the defendants from enforcing certain provisions of chapter 227, Laws of Kansas 1939, and a certain order already entered by the commission, as well as like orders which may be subsequently entered, relating to the production of crude oil and the proration thereof among producers.

Chapter 227, supra, concerns itself with the production of crude oil, and confers certain powers upon the commission in respect thereto. Section 1 defines the term "waste" to include, in addition to its ordinary meaning, economic waste, underground waste, surface waste, waste of reservoir energy, and the production of crude oil in excess of transportation or marketing facilities or reasonable market demands; and it confers authority upon the commission to make rules and regulations for the prevention of such waste. After dealing with the manner in which persons shall produce from a common pool, and authorizing the commission to regulate such taking in a manner which will prevent waste, or independently of waste, will prevent the inequitable or unfair taking as well as unreasonable discrimination, section 2 provides, among other things, that the commission is further authorized, and it shall be its duty, to prevent unreasonable discrimination in favor of any one pool as against any other pool or pools in the allocation of allowable production among such pools; and it further provides that nothing contained in the section or in the act shall authorize the reduction or limitation of full production from any pool whose average well-size is fifteen barrels per day or less. Section 3 provides that the commission shall determine the reasonable market demand for crude oil produced in the state, and shall allocate among the pools the amount which may be produced therein without waste, impairment of correlative rights and unreasonable discrimination between pools; and it delimits the manner in which the determination of the reasonable market demand shall be made. It further provides that in making such allocation among pools, the commission shall take into consideration, among other proper factors, and shall give due weight to the prevention of waste in any pool, the quantity of oil that will be produced from nonprorated pools, and the ratio of the daily productive capacity of each prorated pool to the total daily productive capacity of all prorated pools, after adjustment of such daily productive capacities of such pools has been made in such manner that the ratio will result in an approximately fair and equitable allocation of the production among such pools. It further provides that the commission shall have juris-

diction and authority over all matters involving the application and enforcement of the act. And, in addition, it provides that nothing contained therein is intended to vest the commission with authority to fix the price of crude oil. The act contains other provisions, but they are without application to the questions in hand.

Crude oil was first discovered in Kansas more than fifty years ago. For several years immediately preceding the enactment of the statute here challenged, the daily potential capacity to produce far exceeded market demands. In January, 1934, the potential productive capacity was more than 300,000 barrels, while the demand was slightly more than 100,000 barrels; in January, 1935, it was approximately 397,000 and 141,000 barrels, respectively; in January, 1936, it was approximately 838,000 and 138,000 barrels, respectively; in January, 1937, it was approximately 1,667,000 and 175,000 barrels, respectively; in January, 1938, it was approximately 3,069,000 and 186,000 barrels, respectively; and in 1940 (after enactment of the statute) the productive capacity reached the enormous amount of approximately 5,000,000 barrels. There were and are a great many flush or semi-flush wells, and there were and are a large number of so-called stripper wells, meaning wells having a daily productive capacity of fifteen barrels or less. Oil can be produced in flush or semi-flush wells at less cost than in stripper wells. Stripper wells cannot compete with flush or semi-flush wells in production cost. Prior to proration, there was surplus production, and reservoir energy was expended at an excessive speed. The surplus oil was stored; losses were sustained through leakage, evaporation and oxidation; and fire hazards and other mishaps were present. These conditions brought gross waste, and contributed to instability in the industry. Without some regulation and control, these conditions would have continued and would now exist, instability in the industry would have continued and would now be present, the producers from flush and semi-flush wells would have progressively monopolized the markets, the owners and producers from stripper wells, unable to meet the competition, would have been and would now be compelled to prematurely abandon their wells, tremendous volumes of oil would have been and would now be irrecoverably lost in underground reservoirs, physical and economic waste would have been and would now be sustained, and the welfare of the state would have suffered and would now suffer.

Morgan, Flynn and Cobb own and operate certain oil and gas wells in the Otis pool, and are engaged in the business of producing oil from such wells and selling it. Bay owns a small refinery at McPherson, about seventy miles distant from the Otis pool. It is the only purchaser buying oil produced in the pool, and the oil so purchased is shipped by tank car to the refinery. Bay agreed to buy, and Morgan, Flynn and Cobb, and other producers, agreed to sell on terms mutually satisfactory, oil produced in the pool to meet the market requirements of Bay. The contracts fixed a sliding scale price of the oil based upon the price of gasoline, but a sufficient margin was provided to cover the cost of transporting the crude oil to the refinery and the cost of processing it, and to enable Bay to meet competition in the gasoline market. Prior to the execution of such contracts, Bay had purchased and refined crude oil at a loss.

The commission entered orders fixing allowed production and making allocations of allowables for the months of May, June, July, August and September, 1939. Bay was willing at all times to purchase 2,000 barrels daily from the Otis pool, and the producers were ready, able and willing to produce and sell that amount to Bay upon terms mutually satisfactory; and that amount could have been and can now be produced without waste ratably among the wells within the pool. Bay will desire to purchase and will nominate 2,000 barrels per day from such pool during the ensuing year, and Morgan, Flynn and Cobb can and will desire to produce and sell such amount to Bay at mutually satisfactory prices. Each of the several orders reduced the allowed production in the pool to a volume below that amount. But the total amount which Bay desired to purchase was added in with the nominations of other purchasers and considered in ascertaining the total market demand, and thereafter production was allocated among the several pools in the state in amounts sufficient to satisfy the predetermined market demand. At the time this suit was filed, Bay had on hand only about a two days' supply of crude oil for the operation of its refinery, and at

the time of the hearing, it had on hand about a seven days' supply. Sixty days' supply is not unreasonable. But Bay could purchase crude from others than Morgan, Flynn and Cobb for the operation of the refinery, although the cost would doubtless be greater and Bay would sustain a substantial loss.

The complaint is in conventional form. The statute, the orders of the commission, and other like orders which may later be made for subsequent months, are attacked on the ground that, as applied to plaintiffs, they violate the due process and equal protection clauses of the Constitution of the United States. The District Judge granted a temporary restraining order pending a hearing on the application for temporary injunction. After certain postponements by agreement of the parties, the case was submitted to this court, specially convened in accordance with section 266 of the Judicial Code, as amended, 28 U.S.C.A. § 380, on the question whether a temporary injunction shall be granted, being submitted on admissions contained in the pleadings, stipulated facts, ex parte affidavits and oral testimony; and oral arguments were presented and briefs were filed.

■ Plaintiffs urge that the temporary injunction should be granted for the reason that the ultimate question to be determined is whether the police power of the state extends to the point of denying to a producer of oil the right to produce and sell, and the purchaser the right to purchase, on terms mutually agreeable, where there is neither waste nor impairment of correlative rights within the pool from which the oil is produced; that such question is grave under the Constitution of the United States; and that the injury to plaintiffs will be certain and irreparable if the application is denied and the final decree be in their favor, while if the injunction be granted the injury to the defendants, even if the final decree be in their favor, will be inconsiderable, or may be adequately indemnified by bond. It is well settled that ordinarily a temporary injunction should be granted in a suit of this kind if the questions presented are grave and difficult, and the injury to the moving parties will be certain, substantial and irreparable if it is denied and the final determination be in their favor, while if it is granted and the decision is otherwise the inconvenience and loss to the opposite parties will be inconsiderable or may be ade-

quately protected by a bond. Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972; Love v. Atchison, Topeka & Santa Fe R. Co., 8 Cir., 185 F. 321, certiorari denied 220 U.S. 618, 31 S.Ct. 721, 55 L.Ed. 612; Allen W. Hinkel Dry Goods Co. v. Wichison Industrial Gas Co., 10 Cir., 64 F.2d 881; Pratt v. Stout, 8 Cir., 85 F.2d 172. But it is equally well settled that a court of equity should exert its authority to issue the writ with deliberation and sound discretion; that it should not issue unless the right is reasonably apparent; and that it will not issue where it is sought merely for the purpose of delay in the enforcement of a statute or administrative order promulgated under it. See, Truly v. Wanzer, 5 How. 141, 12 L.Ed. 88; Borg v. International Silver Co., 2 Cir., 11 F.2d 147. The primary and decisive question involved here is whether the statute, and the orders of the commission entered under and pursuant to its provisions, violate due process and equal protection. That question is not to be encumbered with subsidiary contentions of incidental and indecisive importance. In the exercise of our discretion, we think the determination of the question should not be postponed and the state enjoined in the meantime from enforcing the statute.

■ It is well settled that the state, in the exertion of its police power, may legislate to prevent physical or economic waste in the production of oil and gas, and to protect the correlative rights of producers from a common pool. The constitutional validity of statutes designed to attain these ends has been repeatedly sustained. Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Railroad Commission v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368. See, also, Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas. 1912C, 160; Oklahoma v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716, 35 L.R.A.,N.S., 1193; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Thompson v. Consolidated Gas Utilities Corporation, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510.

■ And a state is free to exercise a wide scope of discretion in the selection of

methods or means of reaching such permitted objectives. Whether the statute is wise, or based upon sound economic theory, or is the best means of preventing physical or economic waste, or of protecting the correlative rights of producers of oil, rested exclusively with the legislature and is of no concern to the court, if the means selected have a real and substantial relation to the objects sought to be attained, and are not unreasonable, arbitrary or capricious. We are not free to substitute our judgment for that of the legislature in respect of the reasonableness, wisdom or propriety of the legislation. The sole question within the range of judicial inquiry is whether the statute and the orders entered under it transcend constitutional limitations. McLean v. Arkansas, 211 U.S. 539, 29 S.Ct. 206, 53 L.Ed. 315; Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 55 L.Ed. 328; Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856; Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Railroad Commission v. Rowan & Nichols Oil Co., supra.

■ The purpose of this statute is the prevention of waste of a natural resource, and the protection of the correlative rights of producers. In order to be a valid enactment, it must have a real and substantial relation to the objects sought to be attained, and it must not be unreasonable, arbitrary or capricious, Nebbia v. New York, supra; Thompson v. Consolidated Gas Utilities Corp. supra.

■ It is the contention of plaintiffs that the statute and orders, in their application to plaintiffs, do not have such a relation to the prevention of waste, or the correlative rights of producers, for the reason that the amount of oil which it is sought to produce in the Otis pool can be produced without physical waste. But the contention rests upon the postulate that in determining whether that amount can be produced without waste, the Otis pool must be considered separate, apart and distinct from the balance of the state. As previously stated, grossly wasteful practices were occurring, and as a result the industry was instable. The producers from flush and semi-flush wells were monopolizing the markets, the producers from stripper wells were faced with the necessity of premature abandonment of such wells, and thus enormous quantities of oil would be lost and stupendous waste sustained. That was the condition which existed respecting a natural resource and an industry having to do with it. The state was not completely impotent to deal in any manner with those conditions which were inimical to its welfare. Due process and equal protection did not restrict the legislature to silence and inaction respecting gross waste of a natural resource of such magnitude and importance, or the resulting instability of the oil industry. And, within permitted bounds of constitutional limitations, the legislature was free to make its own choice as to corrective and preventive methods. Of course, need for correction, however immediate and urgent, can never constitute a sustainable basis for legislative action in excess of constitutional limitations; but within such limitations, a state may exercise its own choice of methods and means, provided they have a real and substantial relation to the ends sought to be attained, and are not arbitrary. And once that choice has been exercised, courts are not free to overturn it. Without fullness of elaboration, we fail to find anything in the letter or spirit of constitutional limitations which requires the state in fixing criteria for the conservation of the crude oil industry, in preventing physical and economic waste, in protecting the correlative rights of producers, and in promoting economic stability, to consider each prorated pool separate, apart and distinct from others in determining whether a specified quantity of crude oil can be produced without waste ratably among the wells within such pool. We think the state may in its effort to attain these objectives consider the oil industry of the state as a whole, restrict allowed production to predetermined market demands, prorate the allowed production among the several pools in the manner authorized by the statute, and forbid production in a given pool in excess of the amounts thus allowed, even though a larger amount may be produced without physical waste in that particular pool. If excess production is allowed in one prorated pool, even without physical waste there, total production will exceed total market demands, and that condition contributes to physical and economic waste as well as industrial instability. It thus seems reasonably clear that the provisions in the statute and the orders of the commission, under and through which production in the Otis pool is being restricted to an amount allocated thereto in accordance with the statute, bear a real and substantial

relation to the prevention of physical and economic waste of the oil industry in the state, even though the quantity which it is desired to produce can be produced without actual physical waste in that particular pool, considered separate, apart and distinct from other pools.

Plaintiffs place strong reliance upon Thompson v. Consolidated Gas Utilities Corp., supra, but that case is substantially different in decisive respects. There plaintiffs owned gas wells in the Panhandle field in Texas, and they also owned pipe lines from the field to several large cities throughout the country. Gas could not be stored, and there was no local market for it. To utilize the sweet gas, it was necessary that it be delivered to the ultimate consumer by pipe lines in a continuous flow from the well to the burner tips. Plaintiffs had an adequate supply of gas in their own wells for their market demands, they had no economic occasion to buy gas from wells owned by others, and their operations were conducted prudently and without waste of gas. The court held that the real purpose of the statute and the order promulgated under it, limiting production from wells within the field, was to compel plaintiffs to buy gas from owners of wells in the field with no pipe line or other outlet facilities with which to fulfill their contractual commitments, and that such purpose had no substantial relation to the prevention of waste. Here the essential purpose and object of the statute and the order of the commission is to prevent physical and economic waste. Without taking up seriatim other cases relied upon, it may be said in summary that they are similarly distinguishable.

For the reasons indicated, the temporary restraining order will be vacated and set aside, and the prayer for a temporary injunction will be denied.

HUXMAN, Circuit Judge (dissenting).

I find myself unable to agree with the conclusion reached by the majority.

Injunction is an equitable remedy and the granting or denying of a temporary injunction is governed by broad, general, equitable considerations, gleaned from the facts in each case. No hard and fast rules can be laid down determining when such relief should be allowed.

It is well settled that a temporary injunction should be granted upon the application of a party to a controversy seeking temporarily to enjoin a promulgated regulation under a statute when there is doubt as to either the constitutionality of the statute or the validity of the regulation. Again, there can be no hard and fast rule as to the degree of doubt required concerning the validity of the statute or regulation thereunder. Admittedly, if the loss to the applicant is grave and stands admitted if the statute or regulation is held invalid, and if the granting of the injunction does not detrimentally affect the state if ultimately the statute and regulation are upheld, then less doubt as to the constitutionality of the law or the reasonableness of the regulation will support the granting of a temporary injunction than will be required if the granting thereof would result in loss to the state.

Here it stands admitted that the challenged regulation results in grievous and irreparable loss to the applicant if the statute or regulation should, on final hearing, be held invalid. It also stands admitted that if the injunction is granted and subsequently the regulation is upheld, the state will suffer no ultimate loss.

I know of no statute or regulation that has gone so far in interfering with individual rights guaranteed by the Fourteenth Amendment to the Constitution of the United States as do the statute and regulation under attack here. The right to reduce oil and gas to possession and use the same as one sees fit is a valuable property right. It is protected to the individual by the Fourteenth Amendment to the Constitution. Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Marrs v. City of Oxford, D.C.Kan., 24 F.2d 541; Haskell v. Cowham, 8 Cir., 187 F. 403. It may not be interfered with except as required by paramount public interest, and then the regulation must not only be necessary but also reasonably relate to the public necessity sought to be promoted and reasonably tend to accomplish the same. Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Champlin Refining Co. v. Corporation Commission, supra; Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510.

The legislative body of a state may not under the pretext of serving the paramount public interest interfere with private rights in an oppressive or arbitrary manner.

That the production of oil is affected with a paramount public interest subject to regulation under the police powers of the state is recognized without exception. So, also, the right to regulate the production of oil and gas to prevent physical waste stands unchallenged. It is also quite generally conceded that it falls within the broad police powers of the state to enact proper regulations preventing economic waste of oil and gas.

The powers of the state to regulate the correlative rights of different owners in a common source of supply has not received the consideration of the courts in many cases. In Champlin Refining Co. v. Corporation Commission, supra, the Supreme Court upheld a regulation by the state of Oklahoma adjusting the correlative rights of owners of oil in a common source of supply. The regulation there was promulgated under a statute prohibiting waste and for the purpose of preventing waste in the common source of supply. All the challenged order in the Champlin case did was to prorate the available market in the pool among all the wells in the pool to prevent physical waste. The Supreme Court upheld the regulation on the theory of preventing physical waste as is evidenced by the following language of the opinion (286 U.S. at page 233, 52 S.Ct. at page 564, 76 L.Ed. 1062, 86 A.L.R. 403): "Plaintiff insists that it has a vested right to drill wells upon the lands covered by its leases and to take all the natural flow of oil and gas therefrom so long as it does so without physical waste and devotes the production to commercial uses. But if plaintiff should take all the flow of its wells, there would inevitably result great physical waste even if its entire production should be devoted to useful purposes."

The paramount public interest in oil and gas that will support governmental interference in the property rights of an owner thereof is the conservation of an irreplaceable natural resource. Any regulation to be valid must reasonably relate to conservation. The elements required to sustain valid conservation regulations are summarized by the Supreme Court in Thompson v. Consolidated Gas Utilities Co., supra [300 U.S. 55, 57 S.Ct. 374, 81 L.Ed. 510], where the court said: "Either production greater than the demand or use for an inferior purpose would necessarily involve overground waste of gas. The manner, place, or extent of production might lead to underground waste. We assume that the prohibition of any wasteful conduct, whether primarily in behalf of other owners of gas in the common reservoir, or because of the public interests involved, is consistent with the Constitution of Texas and that of the United States, and that to prevent waste production may be prorated. We assume, also, that the State may constitutionally prorate production in order to prevent undue drainage of gas from the reserves of well owners lacking pipe line connections."

The challenged statute and regulation not only seek to regulate the production of oil and gas in the common source of supply, to the end that physical or economic waste may be prevented or that the correlative rights of owners in the common source may be preserved, but seek to regulate the correlative rights of separate and distinct pools between which there is no connection and between which no drainage can occur. The order, in effect, says to the Otis Pool: "We will not permit you to produce the oil that admittedly you can produce without waste and for which you have a market, because if you do, some stripper pool many miles away will have no market. Therefore, we propose to take from you part of your market and give it to some other source of supply."

Defendant contends that there is but a single market, which they call the state market. The theory advanced is that the purchaser of crude oil from any given pool is the ultimate consumer of the finished product, the gas and oil, and that therefore a given source of supply has no separate market. This argument is more ingenious than persuasive. It is difficult for me to believe that, when an automobile driver stops at a filing station and asks for ten gallons of gas, he is in the market for crude oil. Webster's New International Dictionary defines "market" as: "The region in which any commodity can be sold; the geographical or economic extent of the commercial demand for commodities." I have a market for my products when there are those who are willing and able to buy my commodities. A market for crude petroleum products is not the same as a market for gasoline.

In Thompson v. Consolidated Gas Utilities Co., supra, the Supreme Court held that one person's market may not be taken from him and given to another so that the latter may have a market. It is true that the

facts in that case are somewhat different from what we have here. However, as I interpret the decision, the fundamental principle announced therein is applicable to this case. As I view the decision, it restates the doctrine that before the state may interfere with the right of owners of oil products to do with them as they please, it must establish that it is necessary to do so in order to prevent waste. In syllabus 9 it is stated: "The purpose of the order, as plainly shown by evidence and court findings, was neither to prevent waste nor to prevent undue drainage from the reserves of other well owners, but was solely to compel the pipe-line owners to furnish a market to those who had no pipe-line connections. Held the order is void under the Federal Constitution as a taking of private property for private benefit."

It is argued that it is necessary to deprive the Otis Pool of the right to sell the oil for which it has a market and which admittedly can be produced without committing waste in the pool, because it is necessary to prevent waste in other pools. It is asserted that oil can be produced in flush or semi-flush pools at such greatly reduced cost as compared with cost of production from stripper wells that practically all crude oil buyers will buy all their demand from flush pools and that as a result stripper pools will have no market; that the oil therein will be lost and physical waste will follow. The ultimate conclusion flowing from this line of reasoning is that stripper wells cannot sell oil at as low a price as can wells in flush pools; that they will be forced out of the market and oil left in the wells will be lost; to prevent this waste it is necessary to maintain a price level high enough so they may sell in competition with flush production. For the purpose of this opinion it may be conceded that the state has power to regulate the price of crude oil to prevent economic waste, but even then the means employed to accomplish the purpose must be reasonable and have relation to the object sought to be accomplished. It appears to me to be an unreasonable regulation to deprive a purchaser of crude products of the right to purchase where he can buy most economically and to force him to purchase at a disadvantage to himself, with the object in view of attempting to maintain a price level which will permit stripper pools to operate. Taking one man's market and giving it to another is unreasonable and therefore in violation of the Constitution.

The state undoubtedly has the right to regulate the amount of production to consumptive demand in order to prevent waste, but here again the means employed must be reasonable and have relation to the object sought to be accomplished. A regulation which takes from one person his market for crude oil and gives it to another to prevent over-production, while at the same time permitting unlimited development which further adds to the burden of over-production, is unreasonable. As stated in the majority opinion, we may not substitute our judgment for that of the Legislature as to the best means of accomplishing a permissible governmental function, nor do I mean to indicate the proper remedy, but as stated, we may inquire into the reasonableness of the regulation to the end that one may not be deprived of his rights without due process of law.

For the purpose of this hearing, it is not essential that the constitutionality of the act or the reasonableness of the regulation be finally determined. It is sufficient to inquire whether there is reasonable doubt as to either. I have grave doubts as to the constitutionality of that portion of the statute which authorizes the state to regulate the correlative rights as between pools without reference to the element of waste; and more doubt as to the reasonableness of the challenged regulation. If we once hold that the state may not only regulate this industry, affected with a paramount public interest, in order to prevent waste, but that it may also divide and allocate markets to different consumers or producers disassociated from some form of waste, then we have destroyed the last remaining vestige of free enterprise and have completely regimented the oil industry. It is my opinion that the temporary injunction should be granted.