PETERSON et al. v. GRAYCE OIL CO. et al.
No. 12419.

Court of Civil Appeals of Texas. Fort Worth.
Jan. 31, 1931.

Rehearing Denied March 7, 1931.

De Montel & Sanford, of Wichita Falls, for appellants.

Kilgore & Rogers, of Wichita Falls, for appellees.

DUNKLIN, J.

The Grayce Oil Company and J. H. Cottom, plaintiffs in the trial court, owned an oil lease on about 49 acres of land situated in Wichita county, designated in the record as the Grayce-Cottom lease. Ed Peterson, J. A. McCarty, and F. B. Jackson, Jr., defendants in the trial court, owned another oil lease on about 100 acres of land adjoining that of the plaintiffs, and designated in the record as the McCarty lease. On both of those leases wells had been drilled which produced oil in paying quantities. In order to increase the production of oil from their wells, defendants installed what is known as a vacuum pump, and as a result of the use of the same the production from those wells was increased. The pump so installed was used for about 90 days, and during all of that time there was a decrease in the production from plaintiffs' wells. The plaintiffs then complained to the Railroad Commission of Texas of the action of the defendants in installing and using the vacuum pump, and, after an investigation by a representative of the Railroad Commission of the complaint so made, and which investigation disclosed the use of the vacuum pump by the defendants, the commission ordered a discontinuance of the pump, which order was respected by the defendants.

The plaintiffs instituted this suit against the defendants to recover the value of the oil which they alleged they had lost by reason of the operation by the defendants of the vacuum pump; also for the alleged depreciation in the market value of their lease by reason of the using of the vacuum pump, upon the theory, as reflected in the allegations, that the increased flow of oil caused by the pump had opened subterranean channels between the two leases through which the oil from plaintiffs' lease would and did continuously flow and thereby drain the plaintiffs' lease of oil in excess of any possible drainage through natural agencies which would be operative in the absence of such pump; also for exemplary damages upon allegations that the defendants' action in installing and using the

vacuum pump was taken knowingly and with the willful intention of wrongfully appropriating to the defendants oil from plaintiffs' lease to which they were entitled and which they would have enjoyed but for the use of such vacuum pump.

This appeal has been prosecuted by the defendants from a judgment awarding plaintiffs both actual and exemplary damages.

The trial of the case was before a jury, and the following are the issues submitted to them, with their findings thereon, together with the court's instructions to the jury in connection with those issues:

"1. You are instructed that the term 'proximate cause,' as that term is used in this charge, means the moving and efficient cause, without which the injury in question would not have happened; an act or omission becomes the proximate cause of an injury whenever such injury is the natural and probable sequence of the act or omission in question, and one that ought to have been foreseen by a person of ordinary care and prudence in the light of the attending circumstances.

· "2. You are instructed that in law malice denotes a wrongful act intentionally done without just cause or excuse. If an act is committed deliberately with a present consciousness of invading another's right, such act is deemed in law to have been committed maliciously. Malice may be inferred from circumstances which show either a reckless disregard of the rights of another or a reckless disregard of consequences to another.

"3. You are instructed that if you find actual damage from a preponderance of the evidence, and you further find that such damage resulted proximately from the malicious acts of the defendants, then you may in your discretion, assess exemplary damages by way of punishment and for the purpose of setting a wholesome example to others.

"Issues.

"1. Do you find from a preponderance of the evidence that the pump installed on the McCarty lease on or about April 6, 1929, as operated, created a vacuum? Answer: Yes.

"2. Do you find from a preponderance of the evidence that during the time the pump installed on the McCarty lease was operated there was a decline in the production of oil from the Grayce-Cottom lease?

"3. If you have answered special issue No. 2 'No,' then you need not answer this issue, but if you have answered it 'yes,' then answer:

"Do you find from a preponderance of the evidence that any part of such decline in production on the Grayce-Cottom lease was proximately caused by the operation of the pump on the McCarty lease? Answer: Yes.

"4. If you have answered the preceding interrogatory 'Yes,' then answer:

"From a preponderance of the evidence what amount of such decline in production, if any, on the Grayce-Cottom lease, was proximately caused by the operation of such pump on the McCarty lease, giving your answer in barrels? Answer: 726 barrels.

"5. If you have answered special issue No. 3 'yes,' and have given a number of barrels in your answer to No. 4, then answer:

"From a preponderance of the evidence, what do you find to be the reasonable cash market value of the oil described in your answer to special issue No. 4? Answer: $1,065.87.

"6. If you have answered the preceding interrogatory setting an amount in dollars, then answer the following:

"From a preponderance of the evidence, what amount of money would have been reasonably necessary to have been expended by Grayce Oil Company and Cottom in producing and marketing such additional oil, if any, as you have found in answer to your special issue No. 4? Answer: $44.99.

"7. From a preponderance of the evidence, do you find that the operation of the pump on the McCarty lease proximately caused any decrease in the cash market value of the Grayce-Cottom lease at the time in July, 1929, when such pump on the McCarty lease was disconnected. Answer: Yes.

"8. If you have answered the immediately preceding question in the affirmative, then:

"What amount do you find from a preponderance of the evidence the operation of said pump reduced the cash market value of Grayce-Cottom lease as of the time in July, 1929, when said pump was disconnected? Answer: $10,320.00.

"9. Do you find from a preponderance of the evidence that defendants maliciously applied vacuum to their wells? Answer: Yes.

"10. What amount, if any, do you in your discretion assess against the defendants as exemplary damages? Answer: $5,000.00."

Upon those findings, the court rendered judgment in plaintiffs' favor against the defendants for the aggregate sum of $16,340.88.

The record in this case is voluminous, and the briefs of counsel cover several hundred printed pages, together with supplemental typewritten pages, all of which show diligent research and able presentation of authorities covering every possible phase of the issues involved. It would unduly prolong this opinion to give a discussion of the numerous propositions and counter propositions presented; nor do we deem it necessary so to do. Hence we will confine this opinion to a discussion of what we deem to be the controlling issues only.

The issues of fact so found by the jury were tendered in plaintiffs' pleadings, and they also specially pleaded Rule 40, adopted by the

Railroad Commission of Texas, which reads as follows:

"Rule 40. *Vacuum Pumps Prohibited Except in Certain Cases.*—The future installation of vacuum pumps or other devices for the purpose of putting a vacuum on any gas or oil bearing stratum is prohibited, except as follows:

"(a) In the case of casinghead gas where the same is utilized vacuum may be used, but not more than sufficient to gather the same into the lines and deliver it at the plant. (b) In fields which are depleted or practically depleted, but no vacuum pump shall be installed under authority of subdivision 'b' without a permit from the Railroad Commission after application first made and notice to adjacent lease owners or operators.

"Nothing in this rule shall prevent the use of vacuum in any field where the same is now in use, but the Commission shall have the right, upon complaint, or of its own motion to order the discontinuance or reduction of same, if it shall determine that such use is injurious to the producing formations or in conflict with the Conservation laws of this State."

It was further alleged that that rule was made and promulgated by the Railroad Commission in accordance with the statutes of the state; and an alleged violation of the provisions of that rule was the basis of plaintiffs' suit for damages.

The following are provisions of our Revised Statutes by virtue of which the Railroad Commission adopted the Rules and Regulations, including Rule 40 quoted above:

Article 6023. "Power and authority are hereby conferred upon the Railroad Commission of Texas, over all common carrier pipe lines conveying oil or gas in Texas, and over all oil and gas wells in Texas, and over all persons, associations or corporations owning or operating pipe lines in Texas, * * * and all such persons, associations and corporations and their pipe lines, oil and gas wells are subject to the jurisdiction conferred by law upon the Commission, and the Commission is authorized and empowered to make all necessary rules and regulations for the government and regulation of such persons, associations and corporations and their operations, and the Attorney General shall enforce the provisions of this title by injunction or other adequate remedy and as otherwise provided by law. The word 'Commission,' as used in this title, shall mean the Railroad Commission of Texas. The word 'Commissioner' shall mean any member of the, Railroad Commission."

Article 6029. "The commission shall make and enforce rules and regulations for the conservation of oil and gas:

"1. To prevent the waste of oil and gas in drilling and producing operations and in the storage, piping and distribution thereof.

"2. To require dry or abandoned wells to be plugged in such way as to confine oil, gas and water in the strata in which they are found and to prevent them from escaping into other strata.

"3. For the drilling of wells and preserving a record thereof.

"4. To require such wells to be drilled in such manner as to prevent injury to the adjoining property.

"5. To prevent oil and gas and water from escaping from the strata in which they are found into other strata.

"6. To establish rules and regulations for shooting wells and for separating oil from gas.

"7. To require records to be kept and reports made by oil and gas drillers, operators and pipe line companies and by its inspectors.

"8. It shall do all things necessary for the conservation of oil and gas whether here especially enumerated or not, and shall establish such other rules and regulations as will be necessary to carry into effect this law and to conserve the oil and gas resources of the State."

Article 6042. "Particular powers herein granted to the Commission shall not be construed to limit the general powers conferred by law, and until set aside or vacated by some order or decree of a court of competent jurisdiction, all orders of the Commission as to any matter within its jurisdiction shall be accepted as prima facie evidence of their validity."

Article 6046. "The Commission, when necessary, shall make and enforce rules and regulations either general in their nature or applicable to particular oil fields for the prevention of actual waste of oil or operations in the field dangerous to life or property."

The evidence introduced on the trial showed conclusively that the defendants did not apply for, nor were they granted, any permit by the Railroad Commission to use the vacuum pump.

■ Although oil is of a fugitive nature and may, as the result of the operation of natural subterranean agencies, pass from one location to another, yet it is well settled by the decisions of our Supreme Court that oil in place belongs to the owner of the title to the land, and that an oil lease executed by the fee-simple owner conveys an interest in realty. See Waggoner Estate v. Sigler Oil Co., 19 S.W.(2d) 27, by our Supreme Court in an opinion by Justice Greenwood, in which many of the former decisions of the same court are extensively reviewed. From that rule of decisions it follows that oil in place and belonging to the title owner or leaseholder of the land where it is located may, like surface accretions of the soil, be lost to that owner and become the property of the title holder or leaseholder of an adjoining tract whenever

such flow occurs solely through the operation of natural agencies in a normal manner, as distinguished from artificial means applied to stimulate such a flow.

The contention is made by defendants that, under the common law, the plaintiffs had no cause of action growing out of defendants' use of the vacuum pump to increase the flow of oil from the adjoining lease to their own wells. In that connection they cite the decision of our Supreme Court in Houston & T. C. Ry. Co. v. East, 98 Tex. 146, 81 S.W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827. We quote the following from the syllabus of that decision in 98 Tex. 146: "The owner of the soil has the right to collect by wells and to use, without limitations of amount or use to which it is put, the waters percolating or flowing beneath the surface, though he drains, thereby, the well of a neighboring proprietor to his damage."

It is further contended that Rule 40 of the Railroad Commission can furnish no proper basis for plaintiffs' suit because it does not purport to give a private right of action for damages; that the only authority conferred upon the Railroad Commission by the Legislature was to make regulations for the conservation of oil and gas and the prevention of waste in the interest of the public; that the penalty prescribed by the statutes for the violation of that rule has the effect to exclude and deny any private or individual right of action for such violation; and that the Legislature could not delegate to the commission authority to adopt a rule having the effect of a statute which would give the plaintiffs a right of action for the damages sued for in this case.

█ It will be observed that the provisions of the statutes quoted above confer upon the Railroad Commission very broad powers, and, while the powers so given are for the purpose of "conservation of oil and gas," and "to conserve the oil and gas resources of the State," and other expressions of a like effect, we believe it to be clear that the conservation so intended was for the benefit of legal owners of oil and gas, whether such ownership be in the state or in the citizen, since those commodities would be of no value to any one unless brought to the surface and appropriated to some use; and some of the provisions have direct application to privately owned property. It is also a matter of common understanding recognized by the decisions that oil or gas accumulates in subterranean reservoirs or sands, and that from such common sources they pass or flow through strata of sand which are tapped by wells, and that the pumping of the wells has the effect to draw from the common reservoirs which supply other wells.

In support of their contention that the Legislature could not delegate to the Railroad Commission authority to adopt rules and regulations that would have the effect of a statute giving a private right of action for their infraction, they have cited many decisions following the general rule that the Legislature cannot delegate its legislative authority, such as Railroad Commission of Texas v. H. & T. C. Ry. Co., 90 Tex. 340, 38 S.W. 750; State v. St. L. S. W. R. Co. (Tex. Civ. App.) 165 S.W. 491; Burgess v. American Rio Grande Land & Irr. Co. (Tex. Civ. App.) 295 S.W. 649; Genusa v. City of Houston (Tex Civ. App.) 10 S.W.(2d) 772; Board of Water Engineers v. McKnight, 111 Tex. 82, 229 S.W. 301. They also cite Trimmier v. Carlton, 116 Tex. 572, 296 S.W. 1070, 1079, for a general discussion of the conditions which require the enforcement of that rule of decisions and others to which the rule is not applicable. In the case last cited the trial court held: "That the statutes (article 5107—80, Vernon's 1922 Supplement), authorizing the petition to the board of water engineers and action thereon by them in the creation of a conservation and reclamation district, was a delegation of both legislative and judicial authority to the board, in violation of section 9, art. 1, and section 1, art. 5 of the Constitution."

But that holding was reversed by our Supreme Court, in an opinion written by Chief Justice Cureton, and following a reference to article 2 of our Constitution, providing that the powers of government shall be divided into three distinct departments, to wit, legislative, executive, and judicial, "and no person, or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted," said:

"There is nothing in this article nor in succeeding ones which materially differentiates our Constitution in the respect here involved from those of the other states of the Union. They all provide for the division of the powers of government into three departments, in language similar to our own. 6 Ruling Case Law, p. 144, § 144; Cooley's Constitutional Limitations (8th Ed.) vol. 1, p. 175. It may therefore be said that the general principles of constitutional law, as declared by the various states of the Union, and by the Supreme Court of the United States, on the subject of delegation of legislative power, are applicable and may be examined in determining the meaning of our own constitutional provisions. * * *

"In interpreting and applying provisions similar to our own in various constitutions, in the light of the common law, the courts have found many exceptions to the broad language used, and permitted the delegation of legislative authority for various purposes.

"A fair deduction from the authorities seems to be that inherent exclusive powers of

general legislation may not be delegated. 6 Ruling Case Law, p. 164, § 165. But there are many powers which the Legislature might exercise, and sometimes does exercise, which may be delegated. For example, it is not a delegation of legislative power, in violation of the Constitution, to grant some designated body powers which the Legislature cannot itself practically and efficiently exercise, such as the making of railroad rates. 6 Ruling Case Law, p. 180, § 180; Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 S. Ct. 334, 388, 1191, 29 L. Ed. 636; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014; Trustees of Saratoga Springs v. Saratoga Gas, etc., Co., 191 N. Y. 123, 83 N. E. 693, 18 L. R. A. (N. S.) 713, and cases in the notes. The Legislature may also delegate the power to make rules to carry into effect complete laws. 6 Ruling Case Law, p. 177, § 178. There are various laws on the statutes of this state illustrative of this principle, among which may be named those authorizing the Governor and sanitary commission to fix quarantine lines, and authorizing them to promulgate rules and regulations relative to the subject, and the Railway Commission Act. Smith v. State, 74 Tex. Cr. R. 232, 168 S.W. 522; Mulkey v. State, 83 Tex. Cr. R. 1, 201 S.W. 991; Serres v. Hammond (Tex. Civ. App.) 214 S.W. 596; G. C. & S. F. Ry. Co. v. State, 56 Tex. Civ. App. 353, 120 S.W. 1028.

"The power to find facts upon the ascertainment of which a completed law shall be applicable may also be delegated. 6 Ruling Case Law, p. 175, § 175, page 179, § 179.

"The authorities also hold that while the Legislature may not delegate its power to make a law, it may enact a law to become operative upon a certain contingency or future event; as, for example, a vote of the people to be affected thereby. 6 Ruling Case Law, p. 166, § 167."

And, after citing and discussing many authorities and concluding that the act assailed was not violative of the provisions of our Constitution, the opinion continued as follows: "Again, there is strong support for our conclusion in the proposition previously stated that it is not a delegation of the legislative power in violation of the Constitution to grant to some designated body powers which the Legislature cannot itself practically and efficiently exercise. Authorities, supra. In other words, that the exercise of that particular type of authority is read as an exception into the general language of limitation of the Constitution. It is merely tantamount to saying that the Constitution itself does not require the impracticable or the impossible."

In the case of Oxford Oil Co. v. Atlantic Oil Producing Co., 22 F.(2d) 597, 598, which case arose in Texas and involved the power of the Railroad Commission to regulate the drilling of oil wells, and in which a petition for certiorari was denied by the United States Supreme Court (277 U. S. 585, 48 S. Ct. 433, 72 L. Ed. page 1000), the Circuit Court of Appeals had this to say: "The right of a state to so regulate the drilling of wells for oil and gas as to conserve the rights of adjoining owners is too well settled to admit of serious controversy. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; Lindsley v. Natural Carbonic Gas. Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160. It was within the power of the Legislature to lay down a general rule for the protection of the mineral rights of the owners of adjoining lands, and to leave the details of enforcing that rule to an administrative agency or board. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713."

See also Lindsley v. Natural Carbonic Gas. Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 370, Ann. Cas. 1912C, 160; Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co. (Tex. Com. App.) 298 S.W. 554; State v. Jarmon (Tex. Civ. App.) 25 S.W.(2d) 936, and authorities there cited; 1 Texas Juris. 625.

It is our conclusion that there is no merit in the contention that the alleged violation of Rule 40 of the Railroad Commission could not be made the basis of plaintiffs' asserted right of recovery of actual damages on the ground that the delegation of authority to enact the rule was in violation of the Constitution.

The right of plaintiffs to an undisturbed flow of oil, in its natural course, from the main reservoir or source, even though that reservoir or source is not located on their lease, is appurtenant to their title to the lease; but that right is common also to the holders of other leases which are supplied with oil from the same common source. All of such leaseholders have the right to recover the oil, and the only method so to do is to drill wells, and to pump them, in the absence of a flow without pumping. Necessarily the first wells drilled draw more from the common supply than others drilled later; and thus there may be an unequal distribution among different leaseholders. But from the very nature of the situation that result is unavoidable, and loss to subsequent drillers occurring in that manner may be designated as damnum absque injuria; the policy of law being to favor the diligent. However, according to the rule which seems to be established by the decisions and which appears to be founded upon elementary principles of right and justice, the right of one leaseholder to thus acquire more than his pro rata portion of the common reservoir is limited to the production of oil from a natural flow or from pumping by ordinary methods, to the exclusion of the artificial method of vacuum pumps, which is forbidden by Rule

40 of the Railroad Commission. Such is the effect of the decision of the United States Supreme Court in Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 583, 44 L. Ed. 729. In that case the State of Indiana, through its Attorney General, procured an injunction restraining the Ohio Oil Company from permitting the waste of natural gas from several wells drilled upon its leases, upon allegations, in substance, that the supply of natural gas which had been enjoyed by citizens in the surrounding territory had been greatly diminished. The suit was based upon the provisions of a statute of the state forbidding such waste. The statute was attacked by the oil company on the ground that its enforcement would constitute a taking of private property without adequate compensation, and therefore amounted to a denial of due process of law in violation of the Fourteenth Amendment of the Constitution. That contention was overruled, and the decree granting injunctive relief against the oil company was affirmed. In the opinion reference was made to the rule of decisions in the state of Indiana, to the effect that oil found in land does not become the property of the lease owner until it is reduced to possession, and had this to say:

"If the analogy between animals feræ naturæ and mineral deposits of oil and gas, stated by the Pennsylvania court and adopted by the Indiana court, instead of simply establishing a similarity of relation, proved the identity of the two things, there would be an end of the case. This follows because things which are feræ naturæ belong to the 'negative community;' in other words, are public things subject to the absolute control of the state, which, although it allows them to be reduced to possession, may at its will not only regulate, but wholly forbid, their future taking. Geer v. Connecticut, 161 U. S. 519, 525, 40 L. Ed. 793, 795, 16 S. Ct. 600. But whilst there is an analogy between animals feræ naturæ and the moving deposits of oil and natural gas, there is not identity between them. Thus, the owner of land has the exclusive right on his property to reduce the game there found to possession, just as the owner of the soil has the exclusive right to reduce to possession the deposits of natural gas and oil found beneath the surface of his land. The owner of the soil cannot follow game when it passes from his property; so, also, the owner may not follow the natural gas when it shifts from beneath his own to the property of someone else within the gas field. It being true as to both animals feræ naturæ and gas and oil, therefore, that whilst the right to appropriate and become the owner exists, proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things feræ naturæ all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No devesting of private property under such a condition can be conceived, because the public are the owners, and the enacting by the state of a law as to the public ownership is but the discharge of the governmental trust resting in the state as to property of that character. Geer v. Connecticut, 161 U. S. 519, 525, 40 L. Ed. 793, 795, 16 S. Ct. 600. On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by things feræ naturæ, which it is unquestioned the legislature has the authority to forbid all from taking, in order to protect them from undue destruction, so that the right of the common owners, the public, to reduce to possession, may be ultimately efficaciously enjoyed. Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the state of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others."

■ Even though it could be said that prior to the adoption of the statutes vesting in the Railroad Commission the powers therein enumerated and the adoption of Rule 40 by the commission, the common-law rule as announced in Houston & T. C. Ry. Co. v. East, 98 Tex. 146, 81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827, would be applicable to the production of oil by a leaseholder to the same extent as the production of water from a well drilled which would exhaust the supply of an adjoining property owner, yet we believe that the enactment of those statutes and the adoption of Rule 40 by the Railroad Commission would have the effect to change that common-law rule as applicable to the production of oil and gas, and that the same are valid, in that their effect is merely to protect the right of different lease or title holders in the enjoyment of their coequal rights to acquire oil from a common reservoir.

We have carefully considered plaintiffs' petition, and have reached the conclusion that the allegations of injuries sustained by them were sufficiently specific to apprise the defendants of the nature of the evidence which they might expect plaintiffs to introduce, and hence all assignments of error to the action of the court in overruling special exceptions to the petition for lack of specific allegations of injuries sustained and damages flowing therefrom are overruled, especially in the absence of any showing that during the trial the defendants were taken by surprise by evidence offered by the plaintiffs to sustain the allegations of injuries suffered. 3 Texas Jurisprudence, § 878; Mauldin Drilling Co. v. Weyman (Tex. Civ. App.) 3 S.W.(2d) 585; Glenn v. Levee District, 114 Tex. 325, 268 S. W. 452; Golden v. Odiorne, 112 Tex. 544, 249 S. W. 822.

A further contention is made in appellants' brief that, as a condition precedent of plaintiffs' right of recovery, it was incumbent upon them to allege and prove that casing-head gas produced by the vacuum pump was more than sufficient to gather the oil into the lines and deliver it at defendants' plant; in other words, that the burden was upon the plaintiffs by pleading and proof to negative the existence of facts stipulated in subdivision (a) of Rule 40, to which the rule would not apply.

■ Plaintiffs pleaded in general terms, complaining that the use of the vacuum was in violation of the provisions of that rule, with allegations of injuries resulting from such violation. There was no allegation specifically negativing the exception shown in subdivision (a) of Rule 40, nor have we been cited to any exception to the pleading or objection to testimony introduced by the plaintiffs to make out their defense for lack of such specific allegations in the pleadings; and the facts and circumstances offered by plaintiffs were sufficient, prima facie, to show that the use of the vacuum by the defendants did not come within the exception referred to. The defendant likewise introduced testimony tending to rebut that offered by the plaintiffs on that issue, and there was no claim of surprise by reason of such testimony in the absence of a pleading negativing the exception. Under such circumstances, the point so made in this court, now for the first time, is without merit. 3 Texas Juris, 878.

The testimony showed without dispute that the defendants installed the vacuum pump on their lease and maintained the same for about 90 days, when it was disconnected by order of the Railroad Commission; that during the use of the vacuum pump there was an increase of production from defendants' wells and that during the same period there was a sharp decline in the production of plaintiffs' wells. The plaintiffs' lease was a long narrow strip of land adjoining the defendants' lease, and there were eleven oil wells near the border line between the two leases. On that lease there were a total of some 15 wells, all of which, with the exception of three, produced oil from a sand about 850 feet deep. Three of the wells on defendants' lease and near the boundary line between the two leases likewise were from an 850-foot sand, while others were from a depth of 680 feet, and one was from a 1,780-foot sand.

To make out their case, plaintiffs relied principally upon the decrease in the production of their wells during and after the operation of the vacuum pump, and also upon the testimony of two witnesses, namely, W. P. Olden and E. D. Martin, introduced as experts. The defendants excepted to the testimony of both of those witnesses, on the ground, in substance, that they did not show themselves sufficiently qualified to render their opinions admissible.

Upon the question of his qualification, the witness Olden testified to many years' experience in the oil business, including the drilling of wells, the production of oil therefrom, observing depreciation in production as the result of drilling and other causes; that he had applied air by means of a compressor on a 680-foot sand in order to push the oil from one well to another in wells that were from three to ten years old, but further said that he had never installed or maintained a vacuum pump on his lease; that he had had very little experience in the use of a vacuum; that he would consider plaintiffs' lease settled production or practically so; that, in the determination of the cash market value of a lease of that character, the price of oil entered into it; that given the price of oil at $1.29 in April, 1929, the date when the vacuum in question was installed, and $1.60 in July, 1929, the date when the pump was disconnected,

the reasonable cash market value of a lease of that character would be rather hard to answer; that such cash market value of property of that character runs from $1,000 to $1,250 per barrel. The bill of exception recites that, after the court had overruled defendants' objection for lack of qualification, the witness testified that in his opinion the operation of the pump would depreciate the market value of the lease. In addition to what appears to be his lack of knowledge of the vacuum pump, from recitals in the bill of exception, it appears in the statement of facts that the witness Olden further testified as follows: "I am familiar with the method of determining the cash market value of an oil producing lease, such as this lease that you have described to me. Well, if you go to buy it, you usually estimate it according to the age of the wells and the depth of the sand and the amount of production it has produced. I would think that it would be worth about $1,-250.00 a barrel. The method which I told you is the method of ascertaining its value and the price of oil—that enters into. * * * I testified that I had had no experience with the vacuum and did not know anything about it."

■ We believe that he did not sufficiently qualify to render admissible the testimony given by him as recited in the bill of exception. It is apparent that the answers so given necessarily involved technical knowledge of the construction of a vacuum pump, and also knowledge of the results of its operation, none of which he possessed. Accordingly, the appellant's assignment of error addressed to the admission of the testimony shown in that bill of exception is sustained. Hugh Cooper Co. v. American National Exchange Bank (Tex. Civ. App.) 30 S.W.(2d) 364, and authorities there cited; Gulf, C. & S. F. Ry. Co. v. Hepner, 83 Tex. 138, 18 S. W. 441; J. P. Watkins Land Mtg. Co. v. Campbell, 98 Tex. 372, 84 S. W. 424; Humble Oil Co. v. McLean (Tex. Com. App.) 280 S. W. 557.

■ We are not unmindful of many decisions to the effect that the determination of the qualification of a witness to give in evidence his opinion as an expert, is left largely to the discretion of the trial judge. Many of those decisions might be cited, such as International-Great N. Ry. Co. v. Motley (Tex. Civ. App.) 18 S.W.(2d) 782, and decisions there cited; Texas & P. Ry. Co. v. Moore (Tex. Civ. App.) 7 S.W.(2d) 902; Longenecker v. Ward County Water Improvement District (Tex. Civ. App.) 8 S.W.(2d) 306, 308. However, that discretion is not an arbitrary one which might, under given circumstances, be exercised differently by different judges, according to their individual notions; it must be exercised in accord with settled legal rules and principles and based upon sound judgment. If the testimony given by the witness,

offered as an expert, shows clearly that his opinion, desired to be introduced, is a mere guess, then the court has no discretion to hold him qualified. Bouv. Law Dict., vol. 1, pages 884, 885; Words and Phrases, Second Series, volume 2, pages 64 to 67.

However, we are unable to say that the court erred in admitting the testimony of the witness E. D. Martin, in substance, that, by reason of the use of the vacuum, in his opinion, the market value of the lease was depreciated 25 per cent., in view of the long experience that witness had had in the oil business and his knowledge of the vacuum pump and his observation of the effect of its use in pumping oil.

Hence the assignment of error addressed to the admission of his testimony is overruled; as is also the assignment to the refusal of defendants' request for an instructed verdict in their favor on the whole case.

■ The court erred in failing to give some character of instruction to the jury explaining the meaning of the word "wrongful," as used in his definition of "malice," and applied in issues Nos. 9 and 10 in submitting plaintiffs' claim for exemplary damages. Before the charge was given to the jury, plaintiffs duly presented an objection to the court's failure to define the meaning of that term.

One of the provisions of article 2189, Rev. Statutes, providing for the submission of special issues to the jury, reads: "In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

The use made by the defendants of the vacuum pump could not be legally wrongful unless it was in violation of Rule 40, adopted by the Railroad Commission, if that rule be given effect in plaintiffs' failure, or else contrary to some rule of the common law. None of the issues submitted and none of the instructions given by the court conveyed to the jury any standard by which they might determine whether the use of such a pump was wrongful; the jury being left to determine the meaning of that term according to any standard that might appeal to them. Many decisions might be cited holding that in like situations it is the duty of the court to give the jury a guide in construing the meaning of such terms. Following are some of those decisions which we believe are decisive of the question in favor of the conclusion we have reached: Martin Brown Co. v. Perrill, 77 Tex. 199, 13 S. W. 975; Missouri, K. & T. Ry. Co. v. Long (Tex. Com. App.) 299 S. W. 854; Robertson & Mueller v. Holden (Tex. Com. App.) 1 S.W.(2d) 570; Stanley v. Spann (Tex. Civ. App.) 21 S.W.(2d) 305; Texas Elec. Ry. Co. v. Scott (Tex. Civ. App.) 21 S.W.(2d)

24; Texas Pipe Line Co. v. Watkins (Tex. Civ. App.) 26 S.W.(2d) 1103.

Nor are we able to say, as insisted by appellees, that malice on the part of defendants was conclusively established by the testimony introduced. While the testimony of one of plaintiffs' witnesses as to statements made by Jackson tended to show that he installed and used the vacuum pump for the benefit of defendants and in violation of the known rights of plaintiffs, yet that testimony was flatly denied by Jackson, and other testimony given by him tended to show that he installed the vacuum pump for such use and under such conditions as came within the provisions of exception (a) embodied in Rule 40; and, under all the facts and circumstances in evidence, we believe that the issue of malice, especially as against the other defendants associated with Jackson, was for the determination of the jury, and the court could not determine that issue in plaintiffs' favor as a matter of law.

It was also error for the court to tell the jury in the same definition that "malice" may be inferred from circumstances which show a reckless disregard of the rights of another, or a reckless disregard of consequences to another. In the absence of some statute prescribing that such an inference may be drawn, it was exclusively within the province of the jury to determine whether or not it was warranted; and the instruction so given was upon the weight of the evidence. Cicero-Smith Lbr. Co. v. Denton (Tex. Civ. App.) 16 S.W.(2d) 932; Gimbel v. Gomprecht (Tex. Civ. App.) 36 S. W. 781, and other authorities there cited.

That instruction was subject to the further exception that it was in the nature of a general charge on the issue of permanent injury to the lease, under such decisions as Humble Oil & Refining Co. v. McLean (Tex. Com. App.) 280 S. W. 557; Brammer & Wilder v. Limestone County (Tex. Civ. App.) 24 S.W.(2d) 99; Texas & N. O. Ry. Co. v. Owens (Tex. Civ. App.) 299 S. W. 933.

Without further discussion of the questions of law involved in this case, we will suggest that upon another trial the issues should be so framed as to give the defendants the benefits of exception (a) in Rule 40. We are impressed that perhaps some of the issues are subject to defendants' objections, in substance, that they failed to accord to them the benefits of that exception. But we shall not undertake a decision of those objections, since they may be avoided on another trial, in view of what we have said already. And for the same reason we shall omit a discussion of other objections to some of the issues on the ground that they are upon the weight of the evidence. And in this connection we will add that we believe that plaintiffs should specif-

ically negative the facts enumerated in exception (a) of Rule 40, rather than leave that matter to inference from general allegations, as was done heretofore; especially will this be true if a special exception is addressed to the pleadings for the absence of such allegations. 49 Corpus Juris, par. 169, page 153, and authorities there cited.

For the errors noted above, the judgment of the trial court is reversed, and the cause is remanded for another trial not inconsistent with the conclusions reached in this opinion.

### On Motion for Rehearing.

In their motion for rehearing, appellees insist that the admission of the testimony of the witness Olden would not constitute reversible error, in view of the testimony of E. D. Martin, referred to in our original opinion, and also the following testimony of C. D. Woods, offered as a witness for plaintiff: "From my experience I think that the fact of that vacuum having been applied there would continue to affect the value of it (plaintiffs' leasehold), because it would take out oil that would not have been taken out otherwise. I do not think that the wells on the neighboring lease to which vacuum was not applied would ever thereafter produce in the normal and usual way which they would theretofore have produced, had not vacuum been applied to the neighboring lease. * * * I am fairly familiar with the method generally employed in arriving at the cash market value of a lease of this character. It is generally based upon a per barrel basis, generally sold at so much per barrel."

It is to be noted here that the testimony of the witness Woods was likewise objected to by the defendants on the ground of lack of qualification of the witness as an expert, as shown by a bill of exception in the transcript.

Appellees invoke such decisions as Missouri, K. & T. Ry. Co. v. Dilworth, 95 Tex. 327, 67 S. W. 88; Texas Co. v. Ramsower (Tex. Civ. App.) 255 S. W. 466, the general purport of which is that a reversal will not follow by reason of admission of improper testimony if the truth of such testimony is conclusively established by other testimony which is admitted without objection, and which is sufficient to support the judgment. We believe that those authorities have no proper application here.

The witnesses Martin and Woods testified that the use of the vacuum pump would diminish production from an adjoining lease, by drawing oil therefrom by suction. They then testified, in effect, that, by reason of such decrease of production, the market value of plaintiffs' lease was depreciated, since the market value of a lease having settled production, as was plaintiffs' lease, was generally

fixed on a barrelage basis; that is, by allowing so much for each barrel of production during one day. But, according to other testimony introduced, even settled production may diminish from causes other than the use of a vacuum pump, and the nature of which cannot be determined or known, nor can it be determined how long any lease will continue to produce oil in paying quantities. Under such circumstances, it cannot be said that the testimony of Martin and Woods conclusively showed that, after the pump was disconnected, the market value of plaintiffs' lease was then permanently depreciated by reason of the former use of the pump, and to the full extent of the damages allowed therefor by the jury. As pointed out in our original opinion, the witness Olden was permitted, over defendant's objection, to testify that in his opinion the use of the pump did depreciate the market value of plaintiffs' lease, over and above the loss of oil, while the pump was in operation, notwithstanding he showed by his own testimony that he was not qualified to give such an opinion. And it is impossible to determine just what weight was given to his testimony by the jury.

Furthermore, in the case of Bell v. Blackwell, 283 S. W. 765, 767, by the Commission of Appeals, it was held that, when an error has been committed in the trial of a case, reasonably calculated to work injury to the appellant, a reversal will follow "unless it affirmatively appears no prejudice resulted, or that there was no reasonable doubt of the harmless effect of the error," and that the burden is upon the adverse party to show that the error was harmless. That decision has been cited with approval and followed in many later cases, such as Bain Peanut Co. v. Pinson (Tex. Com. App.) 294 S. W. 536; Parker v. Bailey, 15 S.W.(2d) 1033, expressly approved by the Supreme Court; Lumbermen's Reciprocal Ass'n v. Wilmoth (Tex. Com. App.) 12 S.W.(2d) 972.

■ We overrule the further contention made by appellees that the judgment allowing plaintiffs a recovery for losses of oil during the time the vacuum pump was in operation should be affirmed, even though it should be reversed in all other respects, since the issues with respect to those alleged losses and the alleged depreciation in the market value of plaintiffs' leases cannot be said to be severable, within the meaning of Rule 62a. See, also, Bain Peanut Co. v. Pinson (Tex. Com. App.) 294 S. W. 536, cited above.

The motion for rehearing by the appellees is overruled.

BUCK, J. (dissenting on appellees' motion for rehearing).

The writer cannot concur in some of the conclusions reached by Justice DUNKLIN in overruling appellees' motion for rehearing. In the opinion of the writer, the testimony of E. D. Martin was admissible. It is shown that he had considerable experience with reference to the use of vacuum pumps, and the writer thinks he showed himself qualified to testify as an expert as to the probable effect of the use of such pumps, and the tendency to draw from under adjacent tracts oil. The writer also thinks that he showed himself qualified to testify to the effect that vacuum pumps would have to draw the oil from adjacent tracts through channels of oil-bearing sands. Certainly if this was a damage suit against a railway company for allowing cattle to be exposed to freezing weather, and suffer loss in weight therefrom, a cattle man who had had long experience in raising, feeding and handling cattle, in all kinds of weather, would be qualified to testify as to the effect such cold would have on the cattle, and his expert knowledge would not be the knowledge of the average juror. Or, if there was a suit against a man or corporation for feeding cattle improper food, a cattle man showing himself qualified as an expert, could testify that hay and forage stuff would not put on as much flesh on a cow as cotton seed hulls and cotton seed meal. It might be said in that case, as it is claimed in this, that the witness could not see the process of nature, and could not tell except from experience what sort of food would make cattle fat, or what sort of food would be the best to fatten them. The writer thinks that one who has had a large experience in oil fields, and in the determination of the effect that vacuum pumps have on the increase in oil production, is qualified to testify that vacuum pumps tend to draw the oil from under adjacent tracts, although he never saw such channel made, and was never under the ground where they were made.

The writer has briefly stated his dissenting views, and he thinks that this testimony of E. D. Martin, as well as that of the witness Woods, is sufficiently cogent and positive to justify the trial court and this court to disregard the testimony of W. P. Olden, even though the objection to his testimony be sound, and for this court to affirm the judgment of the trial court. Therefore, in the writer's opinion, the judgment heretofore rendered, reversing and remanding the cause, should be set aside, and a judgment here entered affirming the judgment of the trial court.