## W. H. BUTCHER PACKING CO. v. LANGSTON.

No. 22447. Opinion Filed Oct. 17, 1931.

Rehearing Denied Feb. 9, 1932.

Counts & Counts, for plaintiff in error.

J. Berry King, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., for defendant in error.

KORNEGAY, J. This action was instituted in the lower court by the plaintiff in error, a partnership, filing a petition on the 6th day of May, 1931, and verified on the 1st day of May, 1931, against the defendant in error. The plaintiff in error is a packing company at Oklahoma City. The defendant in error is an inspector, appointed by the Board of Agriculture of the state, for the purpose of inspecting cattle, hogs, sheep, and goats that are being slaughtered in Oklahoma county, the carcasses being used for food for the people of Oklahoma City and the surrounding country.

The petition is rather lengthy. It sets out the relation of the parties, and charges the defendant with forcibly and unlawfully trespassing on plaintiff's place, and annoying and harassing them, and forcibly and unlawfully inspecting their live stock, and with threatening to prosecute them for not having the stock intended for slaughter inspected. The claim is made that defendant is not a legally constituted inspector. Attack is made on Senate Bill No. 197, Laws 1931, ch. 38, art 5, providing for inspection, as being unconstitutional by reason of its applying to only four counties, and by reason of making a distinction between the counties of different populations, based on the last federal census, and not providing for changes in population in the future. Also for the reason that it is based on the census of 1930, and there

was no notice given of its introduction and passage by the Legislature. The bill is further attacked because Tulsa county is exempted from its operation, and because House Bill No. 350 was passed, Laws 1931, ch. 38, art. 6, regulating the matters in other counties, and on a different discriminating inspection charge on hogs, sheep, and goats, and also because other packing plants were allowed to have an inspector on a salary basis instead of a fee basis.

There is a general charge as to avoiding a multiplicity of suits, no adequate remedy at law, great and irreparable injury, insolvency of the defendant, and his threatening and harassing the plaintiff, and making the unlawful inspection. Prayer is for an injunction restraining the defendant from inspecting or attempting to inspect the live stock of the plaintiff, and from assessing or attempting to assess or otherwise impose any charge or assessment against the plaintiff, or against the live stock of the plaintiff, "and from instituting any suits or prosecutions against this plaintiff by reason of said void and unconstitutional act, and for such other and further relief as may be just and equitable, and for the costs of this action."

Several witnesses were introduced, tending to show the conduct of the defendant in going upon the premises and inspecting the stock as slaughtered, and his making the demand for 25 cents a head in accordance with the act. The evidence shows some overtures for making the charge for small animals less, and the Senate Bill is set out and proof made showing that there was no publication of its introduction and passage. House Bill No. 350 is set out at page 18 of the case-made. The relative population of the census of 1930, 1920, and 1910 is set out, and also the answer of the defendant, and an agreed statement of facts is filed, beginning at page 31 of the case-made, as follows:

"It is stipulated and agreed by and between the plaintiff and defendant as follows:

"That the plaintiff is a partnership, composed of W. H. Butcher and Thomas Butcher as copartners, with the place of business at Oklahoma City, county of Oklahoma, state of Oklahoma; that the defendant B. C. Langston is a resident of Oklahoma county, state of Oklahoma, and that said B. C. Langston was, prior to the institution of this suit, and now is, the duly appointed live stock inspector for Oklahoma county, state of Oklahoma, by the State Board of Agriculture of the state of Oklahoma, under and by virtue of Senate Bill No. 197, passed by the State Senate on the 9th day of March, 1931, and the House of Representatives on the 12th day of March, 1931, and approved

by the Governor of the state of Oklahoma on the 19th day of March, 1931.

"It is agreed that a true and correct certified copy of said Senate Bill No. 197 is attached to plaintiff's petition as exhibit 'A,' and that the other exhibits in said petition are true and correct copies and that all of said exhibits may be considered by the court as true and correct.

"It is agreed that plaintiff is engaged in the business of purchasing and slaughtering live stock for food purposes in Oklahoma county, state of Oklahoma, and is the owner of a packing plant in Oklahoma county, Okla., and that in the management and conduct of said packing plant, the plaintiff engaged in purchasing and slaughtering large numbers of live stock, including sheep, cattle, goats, and hogs.

"It is agreed that the plaintiff purchases and slaughters on an average of about 1,950 head of live stock per month, or approximately 75 head of cattle, sheep, goats, and hogs per day, and that at times, when slaughtering, the plaintiff slaughters as many as one head per minute.

"It is agreed that no notice or advertisement by publication for four consecutive weeks in some weekly newspaper of general circulation was ever published in Oklahoma county or any other county in the state of Oklahoma, affected by said Senate Bill No. 197, or House No. 350, giving notice of the intended introduction in the regular session of the Thirteenth Legislature of Oklahoma, of said bills.

"It is stipulated that exhibit 'D,' which is attached to same as exhibit, is a true and correct statement of the annual census of 1910 and 1920 and 1930 of the various counties of the state, and that the 1930 census was officially promulgated on November the 19, 1930.

"It is agreed that the defendant has been coming upon the premises of plaintiff every day since his appointment on the 2nd day of April, 1931, as live stock inspector and has been inspecting plaintiff's live stock.

"It is agreed that this stipulation covers the facts therein stated, but does not exclude the introduction of further testimony."

The trial court refused the injunction, and case-made with assignments of error was brought here. There are 20 of these assignments, but assignments 7 to 9 are treated together, and the first six assignments and assignments 10 to 20 are treated together in the brief and argument. Assignments 7 to 9 are based on admission of testimony and on the asking, on cross-examination, of a plaintiff in error about a statement of the inspector to him that the inspector thought it would be fair to collect on the old fee basis, 25 cents per head for cattle and calves and 10 cents per head for hogs, goats, and

sheep. We can see nothing of an erroneous nature in this, as the matter was being tried before the court on an application for injunction, and what the parties said and did was what the court ought to have known.

Further examination elaborating the same point is complained of, and also about the witness being asked about going to the State Board of Agriculture and talking about the same thing. We do not see that this was harmful either way, but complaint is made that Mr. W. H. Mayes was introduced by the plaintiff in error, and that he was asked certain questions about it, and the court excluded it, and the questions were set out on page 25 of the brief, but we are unable to see what difference the testimony would make either way, so far as the right of the plaintiff to procure an injunction is concerned. It only amounted to showing a willingness on the part of the inspector to inspect the hogs and smaller animals on the same basis as theretofore they had been inspected, though the statute allowed 25 cents for each one. We think that it amounted to nothing either way, and would not prejudice the court, who heard all the matters that were urged on both sides.

At page 30, the complaining party says that he will discuss assignments in error 1 to 6 and 10 to 20 together under the proposition thereinafter set forth. A comparison is made between Senate Bill No. 197 and House Bill No. 350. The Senate Bill covered inspection in counties of over 65,000 population, and the House Bill covered inspection in counties under 65,000 population. Disparagement is made of the provision about keeping a record of the animals inspected in each county over 65,000, and various questions were asked as to how an unqualified and untrained inspector is to know or diagnose diseased animals and that only ante mortem inspection is required, and no post mortem inspection is exacted, and the most vicious part of it is, according to the brief, that a fee of 25 cents was allowed for every animal slaughtered. A diagnosis of House Bill No. 350 is made, which provides for the appointment, on the application of 25 taxpayers, of inspectors in counties of less than 65,000 population, with an inspection fee of 25 cents for each head of cattle and only 10 cents for sheep, goats, and hogs, and disparity between fines is commented on, as well as the provision concerning a salary basis in lieu of fees.

The joint resolution concerning live stock and meat inspection in Tulsa is commented on, and complaint is made that Tulsa has a special law, and there seems to run through the brief an idea that Oklahoma county

was discriminated against in the quality of inspector, and also in the method of paying him, it being provided that Tulsa county would pay their inspectors by taxation, and an appeal is made to the idea that there is a strong presumption that the legislative act is unconstitutional, especially in cases involving the rights, privileges, and immunities of citizens. The cases of In re Assessment of Walters Nat. Bank, 100 Okla. 155, 228 P. 953, and Exchange Nat. Bank of Muskogee v. Board of Equalization of Muskogee Co., 104 Okla. 93, 230 P. 728, are cited. These were tax cases, however, and not cases involving the question of inspection of diseased animals.

An attack is made on the law because it is special and local, whereas a general law could have been made applicable. Discussion is had that in 1917 and 1919, the Legislature made provisions for live stock inspection by general law covering the whole state. The Law of 1919 (Laws 1919, ch. 44) is cited. The failure to prescribe the qualifications, in Senate Bill No. 197, for the inspector is commented on in an unfavorable light, and the haste in passing that bill is referred to, arising out of the Attorney General's opinion that by chapter 38, Session Laws of 1923-24, these provisions were repealed. A case from Missouri is cited and quoted from, reported in 68 S. W. 72 (Henderson v. Koenig) on the subject of the provision in the Missouri Constitution requiring a general law wherever it is applicable, and the decision as to the applicability being a judicial question rather than a legislative one. In that case, it is clear that the court conceded that under those provisions, as applying to St. Louis and Kansas City, special legislation was permissible.

It is very evident that when it comes to police regulations affecting the health of the public, nearly every community stands to itself, and the necessity for regulations largely depends on the community to be regulated. What would be permitted as being perfectly legal in the wide open spaces of Oklahoma would be regarded as a nuisance around a city like Oklahoma City, the question depending upon the locality largely. The point is made that the bill is unconstitutional and is void by reason of discrimination as to fees, penalties, and salaries, complaint being made that 25 cents is the fee allowed in Oklahoma county for the inspection of sheep, goats, and hogs, and that elsewhere it is 10 cents, and the fine for violation elsewhere is less than it is in Oklahoma City.

Complaint is made that one inspector could not inspect all the cattle that were being slaughtered in Oklahoma City, and the inspector would get a large amount of money out of the inspection. No authority seems to be cited especially on that phase of it. However, though the term "inspector" is used, yet it is clear that if more than one inspector was required, it could be accomplished through the medium of deputy inspectors, so that the work could be done effectively, or perhaps the Board of Agriculture would be justified in naming several inspectors, the mere question of the wording in the statute being in the singular not being controlling; our Code provides as a rule of interpretation that the singular includes the plural. It is fair to presume that the same rule of construction would be applied to a legislative enactment, in order to carry out the purposes of the Legislature, especially so if the health of large communities is involved. See sections 2340, 3528, and 3559, C. O. S. 1921, upon the subject of definitions and general provisions, and defining the meaning of words used in statutes.

Quotation is taken from 25 R. C. L. 834, on the subject of salaries and the discrimination therein. However, it must be remembered that the expenses of, and difficulties attending the inspection of stock intended for food are on a different basis. The case cited from Missouri appears to have been under a constitutional provision requiring the Legislature to provide and regulate the salaries of all county officers by a law uniform in its operation. We are not able to find a provision in our Constitution that bears upon the proposition directly as applied to a police regulation, that would forbid the Legislature from making a classification such as we have here.

Several cases from this court are cited, among others being the case of Leatherock v. Lawter, 45 Okla. 715, 147 P. 324, and School Dist. No. 85 v. School Dist. No. 71, 135 Okla. 270, 276 P. 186, on the subject of the local law not being permissible where a general law could be applied. Complaint is made of the exception of Tulsa county by the law applicable to the locality, which provides for not only inspection of the animal, but also of the meat, where the slaughter had occurred for human food; and the case of Levine v. Allen, 96 Okla. 252, 221 P. 771, is cited, with a long list of others from this state and other states. An examination has been had of our cited decisions and all specially cited from elsewhere. They deal largely with questions of the fees of county officers, the establishment and abolition of special courts, the establishment of school districts, levying of taxes, jurisdictions of justices of the peace, procedure in courts of common pleas,

and classifications based on population, abolition of township government, and a large class of special laws conferring special favors upon county officers, some being open and unapologetic, some being slightly cloaked with pretenses, so thin that they would not amount to the dignity of being false. None appear to deal with regulations to protect public health, which naturally are largely local in application.

A careful reading of the authorities themselves, as reported, and also the extracts therefrom in the briefs, convinces us that the Legislature had a duty to perform by the people who eat meat, in order to secure healthy meat and live. It undertook to perform that duty, and in so doing classified the localities on the basis of population of the representative counties. We cannot say that the classification was capricious or oppressive in view of the interests that were to be protected, namely, the public health, on which life itself depends.

The police power is one of the most far-reaching elements in government, and the preservation of the public health is the primary consideration, because without health there is nothing left that the ordinary man could take much interest in. To preserve that, the people that were slaughtering cattle and the other animals ordinarily classed as cattle were required to report to the authorities the time of the slaughter, with a view of having the animals inspected before they were slaughtered, and such as would not appear to be fit for human food be ascertained and the slaughter of them prevented for the purposes of human food. A fee of 25 cents was allowed, which we do not think was unreasonable for a proper inspection, which is highly essential for the purpose of carrying out the law. The enforcement of the law was intrusted to the Board of Agriculture, and pursuant to that law the defendant was appointed an inspector.

We are not concerned with the hypercritical statements that are made in the brief, amounting almost to anathema, as to the occasion of the enactment and the practice in enforcement, as the presumption is that if there are any abuses in the operation of the law, they will be corrected from time to time by the supervising authority, and that the inspection, which the man engaged in the slaughter business is complaining of so bitterly, will be so directed as to make it thorough, and thereby save the health of the people that consume the meat produced by the slaughter of live stock, even though the packer's profits may be lessened as a result of the inspection or the expense thereof.

We have read all of the authorities cited.

There are some inaccuracies of quotation, but they are immaterial. After reading them, we are convinced that under them there is nothing in the law that is unconstitutional. The Legislature was empowered by the Constitution to pass laws on the subject. It has done so. Its wisdom or expediency we do not care to discuss further than we do not think the regulation is unreasonable. In some of the cases cited, the question as to who should judge as to whether or not a general or special law should be applicable is discussed. The great weight of authority, according to the decisions, is that, in the first instance, the Legislature must judge of the applicability of a special or local law as compared to a general law. We hold this a general law. There are a great many special prohibitions contained in section 46 of article 5 of the Constitution with reference to legislative power in local matters, but this does not appear to be one of them. This is a regulation about a matter that must be in its nature largely local. As originally started, it was part of the quarantine law, but no matter what the history had been, this law appears to have been passed by the Legislature in the exercise of a police power, which the Legislature is created to exercise, and which it is its duty to exercise, for the preservation of the public health.

We might discuss and bring authority after authority as to the limits of this power, but we do not think it has been transgressed in this case by the Legislature. Tiedeman on Limitations of Police Power and Cooley on Constitutional Limitations fully discuss it, and the decisions of the Supreme Court of the United States, beginning with the Slaughter House Cases arising in Louisiana, 83 U. S. 36, 21 L. Ed. 394, and the Noble State Bank Case, originating in Oklahoma, 219 U. S. 104, 55 L. Ed. 116, discuss the matter in a great many of its bearings. In the latter case, the court said:

"The reference to article 1, sec. 10, does not strengthen the plaintiff's bill. The only contract that it relies upon is its charter. That is subject to alteration or repeal, as usual, so that the obligation hardly could be said to be impaired by the act of 1907 before us, unless that statute deprives the plaintiff of liberty or property without due process of law. See Sherman v. Smith, 1 Black, 587, 17 L. Ed. 163. Whether it does so or not is the only question in the case.

"In answering that question, we must be cautious about pressing the broad words of the 14th Amendment to a dryly logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights.

They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a nolumus mutare as against the lawmaking power.

"The substance of the plaintiff's argument is that the assessment takes private property for private use without compensation. And while we should assume that the plaintiff would retain a reversionary interest in its contribution to the fund, so as to be entitled to a return of what remained of it if the purpose were given up (see Danby Bank v. State Treasurer, 39 Vt. 92, 98), still there is no denying that by this law a portion of its property might be taken without return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place, it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use. Clark v. Nash, 198 U. S. 361, 49 L. Ed. 1085, 25 Sup. Ct. Rep. 676, 4 A. & E. Ann. Cas. 1171; Strickley v. Highland Boy Gold Min. Co., 200 U. S. 527, 50 L. Ed. 581, 583, 26 Sup. Ct. Rep. 301, 4 A. & E. Ann. Cas. 1174; Offield v. New York, N. H. & H. R. Co., 203 U. S. 372, 51 L. Ed. 231, 27 Sup. Ct. Rep. 72; Bacon v. Walker, 204 U. S. 311, 315, 51 L. Ed. 499, 501, 27 Sup. Ct. Rep. 289. And in the next, it would seem that there may be other cases besides the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume. See Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729, 20 Sup. Ct. Rep. 576, 20 Mor. Min. Rep. 576. At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said.

"It may be said in a general way that the police power extends to all the great public needs. Camfield v. U. S., 167 U. S. 518, 42 L. Ed. 260, 17 Sup. Ct. Rep. 864. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

We think that the lower court, in refusing the injunction, followed the law. The cause is therefore affirmed.

LESTER, C. J., CLARK. V. C. J., and ANDREWS and McNEILL, JJ., concur. SWINDALL and RILEY, JJ., dissent. HEFNER and CULLISON, JJ., absent.

RILEY, J. (dissenting). The Act of the Legislature, article 5, ch. 38, p. 180, S. L. 1931, upheld by the majority decision, in my judgment, is unconstitutional. It is discriminatory, for it denies to the citizens of the few counties of the state to which it applies, rights and privileges possessed by the body of the citizenship, in that these citizens within the scope of the act may be required to pay more for the inspection of animals held for slaughter than is required elsewhere within this state. The law is local—applicable only to citizens of a limited geographical area. Its passage was not prefaced by advertisement, and thus it contravenes section 32, art. 5, Constitution.

The act is special legislation in that it provides solely for inspection on a fee basis in the large counties to which it applies, where the amount of fees recoverable is unconscionable, whereas otherwise and elsewhere by law there is provision for an inspector upon a salary basis. Likewise, no qualifications are required for the appointment of the inspector, whereas, otherwise, by law, inspectors are required to be veterinarians. Also, the penalty prescribed by the act is different for no apparent reason. Thus section 46, art. 5, Constitution, is violated, as well as section 59 of the same article.

It is shown in the presentation of this case that if the inspector for Oklahoma county performed his duty only to the extent of inspecting the animals slaughtered in the four packing plants located here and received the fee allowed therefor, he would receive the magnificent sum of $180,000 per annum, that but one inspector is allowed by the act, and that it is physically impossible for the act to be workable.

This argument is circumvented by the majority upon the fallacious theory that while the term "an inspector" is used in the act, yet, if more than one inspector was required, deputy inspectors may be appointed, or the Board of Agriculture would be justified in naming several inspectors, in that the mere wording in the statute being in the singular not being controlling, the plural will be substituted by the court. Thus, under an act of the Legislature clearly providing for only one official, by interposition of the court, any number of officials are authorized.

Officialdom has been and is the bane of all established governments. Heretofore specific warrant and authority have been required. Recently this court held that where the Constitution specified authority for "a county judge," the Legislature could not authorize, by law, the election or appointment

of two county judges. But now the procreative genius has been discovered: The singular includes the plural! Hereafter each and every authorization for an official heralds the army of officialdom. The grasshopper plague is insignificant in comparison. May a lone dissenter inquire, why not two, three Governors, a la Louisiana, or indeed a thousand, and so with all other of the breed of officials until every person shall spend his time in regulation of his neighbor's business?